F I L E D
United States Court of Appeals
Tenth Circuit

APR 13 2005

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DENNIS DEAN DAZEY, ROY
MATHEW, DIANE LENORE
GRIFFITH, and ROBERT GERALD
CRAFT,

Defendants-Appellants.

Nos. 03-6187, 03-6205,
03-6208 & 03-6228

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CR-02-92-R)**

David W. Lee, Comingdeer, Lee & Gooch, Oklahoma City, Oklahoma, for
Defendant-Appellant Dennis Dean Dazey.

R. Scott Adams, Oklahoma City, Oklahoma, for Defendant-Appellant Roy
Mathew.

Robert L. Wyatt, IV, Wyatt Law Office, Oklahoma City, Oklahoma for
Defendant-Appellant Diane Lenore Griffith.

Stephen Jones, Stephen Jones & Associates, Enid, Oklahoma, for Defendant-
Appellant Robert Gerald Craft.

Susan Dickerson Cox, Assistant United States Attorney (Robert G. McCampbell,
United States Attorney, with her on the brief) Oklahoma City, Oklahoma, for
Plaintiff-Appellee.

Before **KELLY**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Robert Gerald Craft, Roy Mathew, Dennis Dean Dazey, and Diane Lenore Griffith were convicted of conspiracy to commit wire fraud. The defendants were also convicted of a number of substantive counts of wire fraud, securities fraud, and/or money laundering. On appeal, each defendant challenges the sufficiency of evidence for conviction, as well as raising several procedural and evidentiary issues. Mr. Mathew and Mr. Dazey also challenge their sentences. Appellants' convictions and Mr. Mathew's sentence are **AFFIRMED**. Mr. Dazey's sentence is **AFFIRMED** as to all arguments raised in his initial brief, but is **VACATED** in light of *United States v. Booker*, 125 S.Ct. 738 (2005). The case is **REMANDED** to the district court for resentencing in accordance with that decision.

## I. BACKGROUND

The four defendants were implicated in a fraudulent investment company called Wealth-Mart. Wealth-Mart styled itself as an investment fund with a highly lucrative international "bank debenture" investment program that traded in secret overseas markets in accordance with Christian and humanitarian investment principles. Wealth-Mart promised investors very high returns within a few

months. In addition, because Wealth-Mart invested in instruments representing obligations of major world banks (known as "prime banks"), the investors' principal was guaranteed. During the late 1990's, Wealth-Mart solicited over 14 million dollars in investments. Not a penny of the funds investors entrusted to Wealth-Mart's care was invested overseas, and most of it was never returned.

Dr. Craft was Wealth-Mart's charismatic leader. He ran the company out of his "Craft & Sons" offices in Oklahoma City. Although Wealth-Mart was formed by co-defendant Mathew and others, Dr. Craft directed the program from its inception. The other employees at his Oklahoma City office were all subordinate to him. Dr. Craft controlled Wealth-Mart's bank accounts and directed that all invested funds go through him. He presided at daily staff meetings, which often included investors. Although Dr. Craft directed the financial and organizational aspects of the business at these meetings, the meetings were more often motivational and inspirational events, including prayer and gospel singing. Dr. Craft spoke at seminars that he organized to promote the Wealth-Mart program. Investors were impressed with Dr. Craft's speaking style, his religious background and approach, and his apparent ability to acquire very substantial wealth.

Mr. Mathew, a certified public accountant, served both as Wealth-Mart's financial manager and as Dr. Craft's personal accountant. He also created

Wealth-Mart's founding documents. He was introduced to investors as the CPA for the program. At daily meetings, Mr. Mathew frequently addressed the assembled staff and investors, describing the operation of the program and the expected return on investment. Mr. Mathew helped set up a tribal bank that Dr. Craft used to deposit investors' funds and to pay his and the company's expenses. Mr. Mathew also recruited several investors into the program and helped create letters and documents to assuage concerned investors who began complaining when promised returns failed to materialize.

Mr. Dazey was the international financier. Investors understood that Mr. Dazey was the trader, or the liaison to the actual traders, who had the responsibility of placing investments overseas in the lucrative bank debenture market. At Wealth-Mart seminars, Mr. Dazey was introduced as an expert with long experience in international finance. Seminar attendees were treated to lectures by Mr. Dazey on the high returns that could be generated by investing in various bank instruments in secret foreign markets. Mr. Dazey was a long-time friend and associate of Dr. Craft, and they purportedly had been involved in "international trade" together since the early 1990's.

Ms. Griffith was Wealth-Mart's leading sales and customer service representative. She persuaded many people to invest in Dr. Craft's program, including some personal friends and members of her own family. Ms. Griffith

managed relations with these investors as they began complaining about not receiving the promised returns. She assisted with planning and logistics at Wealth-Mart seminars. She also provided various administrative services in support of Wealth-Mart's day-to-day operations.

Wealth-Mart's international investment program was completely bogus. There is no such thing as a "prime bank." The prime bank financial instruments that Wealth-Mart purported to invest in do not exist. The secretive, exclusive market in which such instruments are traded, accessible only to the world's financial elite and Wealth-Mart's select customers, is also purely imaginary. As a government expert witness from the Federal Reserve explained at trial, prime bank investment schemes like Wealth-Mart's are a common variety of Ponzi schemes. The usual script for a prime bank fraud has the promoter promising very high returns with no risk. The promoter solicits investment in fictitious instruments with complex-sounding nomenclature, which purport to represent debt obligations of major world banks. The promoter often claims that the instruments are guaranteed by public institutions such as the Federal Reserve, the World Bank, or the International Monetary Fund. Promoters tend to emphasize the exclusive and secret nature of the program and sometimes require investors to sign nondisclosure agreements.

The Wealth-Mart program followed this template to the letter. By late

summer of 1997, Dr. Craft, Mr. Mathew, Ms. Griffith, and others began enticing investors into the program. The sales force described Wealth-Mart as a bank debenture trading program that would provide enormous returns with no risk. Wealth-Mart's marketing materials hyped the lucrative European intra-bank market and explained that the market was so secret that those with access to the market might deny its existence and that the investors' own brokers or bankers likely had not heard of it. Wealth-Mart Investors were required to sign nondisclosure agreements.

The Wealth-Mart sales pitch routinely exploited investors' religious convictions. Dr. Craft was portrayed as a devout Christian and humanitarian, while Mr. Dazey and Mr. Mathew were said to be active ministers. Some investors entrusted funds to Wealth-Mart based on its principals' religious *bona fides* and were attracted to the program in part because they were told their money would be used to advance charitable causes.

Wealth-Mart put on three investment seminars at a luxurious ranch in Colorado. The defendants chartered airplanes and buses to transport themselves and investors to the seminars. Dr. Craft presided at the seminars, made speeches, mingled with the potential investors, and in general attempted to create the aura of an elite gathering of international financial insiders. Dr. Craft presented Mr. Dazey to the audience, under the alias "Wooly West," as Wealth-Mart's

international trader. Wooly West addressed the seminar participants on international financial topics and touted his financial connections. He dropped names like Nixon and Rockefeller as being among his former clients. Many seminar invitees were impressed and decided to place investments, or increase their existing positions, with Wealth-Mart.

The money rolled in. In less than two years, Wealth-Mart acquired at least 14 million dollars. To receive the investors' money, Wealth-Mart set up a bank called First Lenape Nation Bank. First Lenape appeared to be a functioning tribal bank. In reality, it was just a shell, and investors' money was commingled and passed upstream to two accounts at established Oklahoma banks. These accounts were all controlled by Dr. Craft. A few investors sent their money directly to an account at Nations Bank controlled by Mr. Dazey.

None of the money was invested overseas. Dr. Craft spent much of it on personal expenses for himself and his family, including cash payments to family and associates, fancy cars for himself and his family, and a house for his son. Dr. Craft also used investor funds to acquire interests in real estate, oil and gas leases, a restaurant, an emu ranch, and a movie production company. Wealth-Mart burned additional investor money on lavish travel such as chartering private airplanes and a Caribbean cruise for Wealth-Mart employees and their families. Approximately two million dollars of investors' money went to Mr. Dazey's

account, which he used to pay debts and expenditures arising from other business ventures.

Inevitably, investors began complaining when hefty checks representing the results of Wooly West's savvy trading failed to arrive in the mail. Mr. Mathew and Ms. Griffith devised a "re-entry" plan to stall for time. They asked investors to sign a re-entry form allowing Wealth-Mart to reinvest their accumulated earnings. Investors were thereby deceived into believing that the reason they hadn't been paid was that Wealth-Mart had rolled their earnings into new investments. Dr. Craft and Ms. Griffith, among others, offered increasingly preposterous excuses to suspicious investors who demanded to know what had become of their money. In addition to variations on the standard "the check is in the mail" theme, investors were told that various government entities had held up or frozen the funds, including the Federal Reserve, FBI, and CIA. Princess Diana's death and other world events were also blamed for the delay in repatriating the funds.

Wealth-Mart's activities eventually came to the attention of the authorities. Some investors, cooperating with law enforcement, made clandestine tape recordings of meetings at the Craft offices. The FBI executed search warrants at the Craft offices and recovered numerous Wealth-Mart documents at Mr. Mathew's home. Later, a federal grand jury issued an indictment charging the

four appellants, as well as another Wealth-Mart employee named Denise Jones, with conspiracy, wire fraud, securities fraud, and money laundering. Ms. Jones pled guilty and testified for the government. After a three-week trial, the jury convicted Dr. Craft on all 59 counts on which he was charged, including one count of conspiracy and several counts each of wire fraud, securities fraud, and money laundering. Mr. Mathew was convicted of conspiracy and money laundering, but was acquitted of securities fraud. The jury convicted Mr. Dazey of conspiracy and several counts of wire fraud and one money laundering count, but acquitted him of one wire fraud count. Ms. Griffith was found guilty of conspiracy and wire fraud, but found not guilty of securities fraud.

The district court sentenced Dr. Craft to 180 months in prison. Mr. Mathew was sentenced to 46 months, and Mr. Dazey was sentenced to 121. The district court departed downward from the Guidelines range for Ms. Griffith and sentenced her to 50 months.

## II. DISCUSSION

### A. Sufficiency of Evidence

Each of the appellants challenges the sufficiency of evidence to convict on all counts. Sufficiency of evidence is a question of law that we review *de novo*. *United States v. Rahseparian*, 231 F.3d 1257, 1261 (10th Cir. 2000). We examine all of the evidence and the reasonable inferences to be drawn from that evidence,

to determine whether any rational juror could have found the elements of the crime beyond a reasonable doubt. *Id.* at 1261-62. We view the evidence in the light most favorable to the government. *United States v. Owen*, 15 F.3d 1528, 1532 (10th Cir. 1994). We do not weigh conflicting evidence or evaluate witness credibility; these are the exclusive province of the jury. *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002). As long as the jury's inferences are reasonable, "it [is] for the jury, not the court, to determine what may have occurred." *Rahseparian*, 231 F.3d at 1262 (quoting *United States v. Grissom*, 44 F.3d 1507, 1510 (10th Cir.1995)).

### 1. Conspiracy

All of the appellants were convicted of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. Each appellant now argues that there was insufficient evidence to sustain that conviction.

A conviction of conspiracy under 18 U.S.C. § 371 requires: (1) an agreement, (2) to break the law, (3) an overt act, (4) in furtherance of the conspiracy's object, and (5) proof that the defendant wilfully entered the conspiracy. *United States v. Hanson*, 41 F.3d 580, 582 (10th Cir. 1994). "The core of a conspiracy is an agreement to commit an unlawful act." *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992) (quoting *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991)). "[T]he critical inquiry is

whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." *Morehead*, 959 F.2d at 1500 (quoting *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985)). Because "[s]ecrecy and concealment are essential features of successful conspiracy," *Blumenthal v. United States*, 332 U.S. 539, 557 (1947), direct evidence of conspiracy is often hard to come by. Therefore, conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action. *United States v. Hardwell*, 80 F.3d 1471, 1482 (10th Cir. 1996). Finally, a conspiracy conviction requires at least the degree of criminal intent necessary for the substantive offense itself. *Morehead*, 959 F.2d at 1500 (quoting *Ingram v. United States*, 360 U.S. 672, 678 (1959)).

Dr. Craft contends that there was no evidence that he agreed with anyone to defraud investors and no evidence that he knew that the Wealth-Mart program was a fraud. He relies heavily on the testimony of Denise Jones, an alleged co-conspirator and cooperating witness. Ms. Jones testified that, in her opinion, Dr. Craft believed in the legitimacy of Wealth-Mart and continued to believe in it even after being indicted. Ms. Jones also said that she herself continued to believe there was an actual trading program until she was indicted. Many

-11-

investors also testified that they believed in the program, at least until their money disappeared. In light of this evidence that so many Wealth-Mart participants, including Dr. Craft himself, believed in the program, Dr. Craft contends that the government presented insufficient counter-evidence that he intentionally agreed to defraud investors.

Ms. Jones's affirmation of Dr. Craft's innocence was less than unequivocal; indeed she ascribed his apparent belief in the program to his being "delusional." Tr. 779. More importantly, the government provided ample evidence that Dr. Craft knew Wealth-Mart was a fraud. The jury was entitled to credit that evidence rather than Ms. Jones's opinion about what Dr. Craft believed. The jury heard evidence that Dr. Craft directed and controlled Wealth-Mart's operations, including its bank accounts. The government showed that several investors, after hearing Dr. Craft pitch his international trading program, wired money into Dr. Craft's accounts. The evidence showed that Dr. Craft diverted those funds to buy houses and cars for himself and his family. Dr. Craft told investors he would invest their money in certain foreign bank securities, but none of it was so invested. He also told investors that he would guarantee Wealth-Mart investments with his own personal assets, which the investors believed to be substantial, when in fact he had no significant assets other than money he diverted from Wealth-Mart investors. When investors complained, Dr. Craft told them that

payout was imminent and offered false excuses for the delay. This evidence is more than sufficient to support an inference that Dr. Craft knew Wealth-Mart was fake and that he intentionally conspired to defraud investors.

Mr. Mathew also challenges his conspiracy conviction. He claims that the evidence showed only that he was associated with Dr. Craft, assisted with some accounting matters, and was present at certain Wealth-Mart meetings. He concedes that this evidence may have given him some knowledge of others' involvement in a crime, but he maintains that this is insufficient to show that he himself participated in the conspiracy. *See United States v. Migliaccio*, 34 F.3d 1517, 1521-22 (10th Cir. 1994) (a defendant's knowledge of his business partner's intent to commit fraud was insufficient alone to prove conspiracy).

However, the government's evidence showed that Mr. Mathew's participation in Wealth-Mart went well beyond mere association with Dr. Craft and attendance at meetings. Mr. Mathew developed Wealth-Mart's founding documents and forms used for agreements with investors. He made presentations at staff meetings in which he described how the investment program operated and estimated the potential return on investment. Mr. Mathew was introduced to prospective investors as Wealth-Mart's CPA, a fact which at least one investor said enhanced his perception of Wealth-Mart's legitimacy and contributed to his decision to invest.

Mr. Mathew was aware that investors were complaining about not being paid. He, along with others, hatched a plan to stall for time by inducing investors to sign a "re-entry" form. The form led investors to believe that their investments were successful and that Wealth-Mart would "re-enter" their earnings into the program. Mr. Mathew was also involved in creating the First Lenape bank accounts Dr. Craft used to deposit investor money, and he was present at a meeting where Dr. Craft said that he was using those accounts to make it difficult to trace the transactions.

Mr. Mathew also recruited investors into the program. One of his recruits, Ricky Sanchez, demanded his money back. Mr. Mathew attempted to stall Mr. Sanchez with excuses about trouble repatriating the money. Mr. Mathew then paid Mr. Sanchez using investment funds he had recently solicited from another investor.

This evidence is sufficient for a reasonable jury to infer that Mr. Mathew intentionally conspired to defraud investors. Mr. Mathew maintains that he took certain steps to distance himself from Wealth-Mart, such as filing an involuntary bankruptcy petition against Dr. Craft and providing information to the FBI. However, the government argues that these steps are also explainable as self-serving actions to attempt to exculpate himself. Whichever interpretation is true, this evidence does not preclude a reasonable jury from concluding that Mr.

Mathew conspired with the other defendants to commit fraud.

Mr. Dazey also argues that there was insufficient evidence to convict him of conspiracy. He contends that there was no evidence of any connection between himself and Wealth-Mart and no evidence that he solicited any investors. The evidence, according to Mr. Dazey, showed only that he was a friend of Dr. Craft who gave informational presentations at the seminars.

The evidence showed more than this. Denise Jones testified that Mr. Dazey was involved with Dr. Craft in an earlier investment scheme similar to Wealth-Mart and that some of the money had been diverted for Mr. Dazey's personal use. The evidence showed that some Wealth-Mart investors deposited or wired money directly to Mr. Dazey's bank account, and that Mr. Dazey received approximately $2.2 million from Wealth-Mart. Mr. Dazey maintained frequent contact, via phone and fax, with Dr. Craft. He provided cell phones that Dr. Craft and Denise Jones used to carry on the scheme. At seminars packed with potential investors, Mr. Dazey presented himself as an experienced international investor with special contacts. Mr. Dazey told investors that he was the trader with whom their investments would be placed. He praised investment programs like Wealth-Mart's as lucrative and safe. All of this evidence, viewed in the light most favorable to the government, was sufficient for the jury to conclude that Mr. Dazey knowingly conspired with the other defendants to commit wire fraud.

-15-

Finally, Ms. Griffith also argues that the evidence was insufficient for a conspiracy conviction. She concedes that the evidence shows that she was an active and willing participant in the Wealth-Mart program. However, she avers that she believed in the program and Dr. Craft all along, that her actions were consistent with a true believer in the program, and thus that there was insufficient evidence that she *intentionally* conspired to defraud anyone.

The government responds that there was considerable evidence that Ms. Griffith knew Wealth-Mart was a fraud. Ms. Griffith was close to Dr. Craft and was one of three or four people who had direct access to him. She was one of Wealth-Mart's leading salespersons, and she persuaded many investors, including personal friends and family members, to invest. Ms. Griffith played an important role in communicating with investors as complaints began coming in. She sent faxes and e-mails reiterating Dr. Craft's excuses and assuring investors that they could expect payment very soon. Investors had multiple communications back and forth with Ms. Griffith over many months in which the investor repeatedly asked for his money back while Ms. Griffith repeatedly responded by blaming the delay on uncontrollable international factors and promising imminent payment. She continued to make such promises long after the investors themselves had given up hope of ever seeing their money again. Cooperating witness Denise Jones testified that Ms. Griffith, together with Mr. Mathew, devised the "re-entry"

plan, in which investors would be told that their investments were doing well and that their earnings would be re-invested back into the program. Ms. Griffith then pitched the re-entry program to the investors, including the promise of a 10% bonus if they stayed in the program for 12 months. The government also provided evidence that Ms. Griffith knew that the FBI had searched the Craft offices in 1999 and that she was served with notice of a fraud lawsuit against herself and Dr. Craft. Finally, the government offered evidence that Dr. Craft gave Ms. Griffith a slice of the profits, including $39,000 over a six-month period, some "walking around" cash, a Caribbean cruise, and a Lincoln.

Some of this evidence is not as damning as it might seem. Ms. Griffith points out that $39,000 was small change compared to what Dr. Craft, Mr. Dazey, and other friends and family of Dr. Craft received. While Ms. Griffith's receipt of a Lincoln seems on par with the late model Cadillacs and SUV's that Dr. Craft and his family bought with investors' funds, Ms. Griffith's son-in-law testified that her Lincoln, at the time she received it, was past its prime, with high mileage and a driver's seat stubbornly stuck in the fully-reclined position. Ms. Griffith traveled to Colorado by bus, while Dr. Craft, Mr. Dazey, and others traveled in private planes. She was relegated to double room occupancy at the Colorado lodges, while others had their own rooms.

Ms. Griffith claims that additional evidence supports her claim to have

been deceived by Dr. Craft. Investors testified that Dr. Craft put up a very persuasive front of being a trustworthy Christian businessman with a long history of successful ventures. Ms. Griffith maintains that there was nothing obviously suspect about the program, as evidenced by the fact that many of the investors, some of whom were licensed securities brokers and other experienced professionals, believed in it enough to invest substantial sums. Ms. Griffith's sincere belief in the program was also supported by evidence that she solicited investments from her own family and personal friends, who put over a quarter of a million dollars into Wealth-Mart.

Ms. Griffith relies on *United States v. Rahseparian*, 231 F.3d 1257 (10th Cir. 2000). In that case, two brothers were running a fraudulent telemarketing scheme, and their father handled all of the scheme's banking needs through bank accounts of his own separate personal business. We held that there was insufficient evidence to prove that the father knew the scheme was fraudulent, even though he conducted all of the company's banking, communicated frequently with his sons about the incoming deposits, and made false exculpatory statements to the police. *Id.* at 1263-64. Ms. Griffith argues that the evidence against her was similar to that in *Rahseparian*. It showed that she played an important role in a business that turned out to be fraudulent, but that is insufficient to prove her criminal knowledge.

However, in *Rahseparian*, we found it important that "[t]here is no evidence [the defendant] was aware of the misrepresentations being made to customers, or that they were not receiving their products or promised prizes." *Id.* at 1263. Here, by contrast, there is no doubt that Ms. Griffith knew that investors were not being paid, and she played a central role in staving off their demands for return of their money with false promises of imminent payment. It is possible that Ms. Griffith believed the implausible excuses and promises of repayment she passed on to investors from Dr. Craft, even as the promises repeatedly turned out to be false. But the jury was entitled to conclude otherwise, especially in light of the undeniable implausibility of these representations. *See United States v. McCrimmon*, 362 F.3d 725, 729-30 (11th Cir. 2004) (highly implausible statements by salesperson, including guarantee of high returns without risk, are suggestive of fraud). We conclude that Ms. Griffith's communications with investors and implementation of the re-entry plan, together with all the other evidence, was sufficient to support Ms. Griffith's conviction.

## 2. Wire Fraud and Money Laundering

Dr. Craft claims there was insufficient evidence to sustain his convictions for wire fraud, securities fraud, and money laundering. However, his brief offers no argument on this point, and therefore we do not consider it. *See Utahns for Better Transp. v. United States Dept. of Trans.*, 305 F.3d 1152, 1169, 1175 (10th

Cir. 2002) (issues not adequately briefed are deemed waived).

Mr. Mathew argues that there was insufficient evidence to convict him of two counts of money laundering in violation of 18 U.S.C. § 1957. To sustain a conviction under § 1957, the government must prove that the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity. *United States v. Massey*, 48 F.3d 1560, 1565 (10th Cir. 1995).

Mr. Mathew was convicted for cashing two checks payable to himself drawn on the account of Dr. Craft's First Lenape Nation Bank, which in turn was an account at the First National Bank of Oklahoma. Mr. Mathew argues that there was insufficient evidence to prove that he knew that the money was criminally derived. However, the government provided evidence that Mr. Mathew knew that the funds in the First Lenape Nation account came primarily from investors, and that he knew that those funds were fraudulently obtained. The government need not meticulously trace the funds involved in a monetary transaction offense or prove that the funds could not have come from a legitimate source. *See United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992). The government's evidence was sufficient to support an inference that Mr. Mathew had the requisite knowledge that the money from the checks came from illegal activity.

Mr. Dazey was convicted of several counts of wire fraud based on cell phone conversations between Dr. Craft and investors. Mr. Dazey concedes that he gave Dr. Craft the cell phone that he used for these conversations. Mr. Dazey contends, however, that there was no evidence that he knew or intended that the phone would be used to further a fraudulent scheme.

In order to sustain a conviction for aiding and abetting wire fraud, the government must prove that Mr. Dazey willfully assisted the perpetrators of the wire fraud crimes, and that he did so with the requisite intent to defraud. *United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002). As set forth in Part II(A)(1) above, the government provided substantial circumstantial evidence that Mr. Dazey was a knowing participant in the Wealth-Mart fraud. This same evidence supports an inference that, when he gave the cell phone to Dr. Craft, he intended that the phone would be used to facilitate their fraudulent scheme.

Mr. Dazey also challenges the sufficiency of evidence for his money laundering conviction. He claims there was insufficient evidence that the money he transferred from his account to the First Lenape account actually came from illegal activity and that he knew that the money was criminally derived. Mr. Dazey was convicted of money laundering for wiring $100,000 from an account he controlled to an account at Dr. Craft's First Lenape Nation Bank. The evidence showed that on August 29, 1997, Mr. Dazey's account balance was $46,

691.07. Gov't Exh. 303. Throughout September, Mr. Dazey received four transfers totaling about $300,000 of investors' funds from Dr. Craft, including a transfer of $150,000 on September 29. *Id.* That same day, Mr. Dazey transferred $100,000 back out of his account to First National Bank of Chickasha, Oklahoma, in the name of Dr. Craft's First Lenape bank. Gov't Exh. 303.7. Without the receipt of the investors' funds throughout September, Mr. Dazey's account did not have sufficient funds to wire the $100,000. This is sufficient evidence to show that the transaction involved criminally derived property. *See Johnson*, 971 F.2d at 570.

As for the intent element, the government provided substantial circumstantial evidence that Mr. Dazey intentionally entered a conspiracy with Dr. Craft to defraud investors via the sham Wealth-Mart trading program, as discussed in Part II(A)(1) above. This same evidence would allow a reasonable jury to conclude that Mr. Dazey knew that the $100,000 he transferred was fraudulently obtained.

Ms. Griffith argues that there was insufficient evidence to sustain her convictions on several counts of wire fraud. These convictions were based on wire transfers to Wealth-Mart from investors that Ms. Griffith brought into the program. Ms. Griffith challenges these convictions on the same ground as her conspiracy conviction, namely, that there was insufficient evidence that she knew

that Wealth-Mart was a fraud.  We reject this argument for the reasons explained in Part II(A)(1) above.

## B.  Jury Instruction

Dr. Craft contends that the jury instruction on aiding and abetting erroneously stated that a defendant could be found guilty of conspiracy without the commission of an overt act.  The government responds that a copy of the form jury instruction that was sent to Dr. Craft's appellate counsel omits the "overt act" requirement, but that the instruction that was actually used at trial contains the necessary language.  The government is correct.  *See* Griffith App., Vol. 1, doc. 230, Instruction No. __, "Conspiracy and Aiding and Abetting – Distinguished."  There was no error.

## C.  Severance

Before trial, Ms. Griffith moved for severance, arguing that being tried jointly with the other defendants would deprive her of a fair trial.  The district court denied the motion on the ground that Ms. Griffith had not adequately demonstrated that she would be prejudiced by a joint trial.  We review a district court's denial of a motion for severance for abuse of discretion.  *United States v. Zafiro*, 506 U.S. 534, 538-39 (1993); *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994).

Ms. Griffith contends that she should have been granted a separate trial for

two reasons. First, she argues that she and her co-defendants had mutually antagonistic defenses, as her defense required her to point the finger at Dr. Craft and Denise Jones. Second, Ms. Griffith claims that the "spillover" effect from the overwhelmingly damaging evidence against Dr. Craft prejudiced her, as she was tainted by association with Dr. Craft even though the evidence directly against her was slight.

To warrant a finding that a district court abused its discretion by not severing a trial, the conflict between the defendants' defenses must be such that "the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *Linn*, 31 F.3d at 992 (quoting *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir.1985)). Ms. Griffith's defense was not mutually exclusive in this sense with the other defendants' defenses. It would be perfectly logical for the jury to believe both that Ms. Griffith believed that Wealth-Mart was legitimate and that Dr. Craft himself believed in the program. The district court did not abuse its discretion in denying severance on this ground.

As for the second ground, a defendant cannot obtain severance simply by showing that the evidence against a co-defendant is more damaging than the evidence against herself. *United States v. Emmons*, 24 F.3d 1210, 1218-19 (10th Cir. 1994). The Supreme Court, however, has noted that "[w]hen many defendants are tried together in a complex case and they have markedly different

-24-

degrees of culpability, [the] risk of prejudice is heightened." *Zafiro*, 506 U.S. at 539. That is an apt description of this case. Nevertheless, even in such situations, severance is not necessarily required because "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id*. Moreover, the Supreme Court has made it clear that the "determination of the risk of prejudice and any remedy that may be necessary" should be left to "the sound discretion of the district courts." *Id*. at 541.

The district court's conclusion that a joint trial would not be sufficiently prejudicial to warrant severance was not an abuse of discretion. Although the case was complex, it should not have been inordinately difficult for the jury to separate the single, crucial question of Ms. Griffith's defense (whether she knew Wealth-Mart was a fraud) from the other issues in the case. The jury was appropriately instructed that each count was a separate crime and that they were to consider the culpability of each defendant separately. *See* Griffith App., Vol. 1, doc. 230, Instruction Nos. __, "Counts are Separate Crimes" and "Consider Each Defendant." Finally, the jury verdict itself suggests that the jury considered each defendant separately, because although Dr. Craft was convicted on all counts, each of the other defendants, including Ms. Griffith, was acquitted of some of the charges against them.

### D. Admission of Notes

At trial, the government offered testimony from several people who attended Wealth-Mart's Colorado seminars. Some of these investors took notes. The government offered, as exhibits, the seminar notes of three such investors. The district court admitted the notes over defense counsel's objection. On appeal, Appellants Craft and Dazey contend that the district court erred in admitting the notes. We review a district court's evidentiary rulings for abuse of discretion, and our review of decisions to admit evidence over hearsay objections is especially deferential. *United States v. Hernandez*, 333 F.3d 1168, 1176 (10th Cir. 2003).

Appellants claim the notes are inadmissible hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). The government argues that the notes are not hearsay, because they were offered to prove only the content of the seminar speeches and not the truth of what was said. This is true in part, but the notes are still hearsay insofar as the notes are in effect an out-of-court assertion that Dr. Craft and Mr. Dazey said certain things at the seminars. The notes were offered to prove the truth of that assertion, and therefore they fit the definition of hearsay.

Federal Rule of Evidence 803(5) provides an exception to the hearsay rule for a witness' recorded recollection:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable

the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

When defense counsel objected to admission of the notes, the district court asked "Why is this not a past recollection recorded?" Tr. 47. Defense counsel responded, "We don't think the foundation has been established for that." *Id*. The district judge himself then asked the witness, "Did you make these notes contemporaneously with the events that occurred?" *Id*. at 48. The witness responded affirmatively, and the judge permitted the witness to continue testifying about the notes and also admitted the notes as an exhibit.[1]

On appeal, the appellants acknowledge that the judge and the government laid a partial foundation for admission of the notes under Rule 803(5), but they claim that the witnesses' inability to testify fully and accurately from memory was never established. The government concedes that neither the prosecutor nor the court specifically asked the witnesses whether their memory was sufficient to testify fully without the notes, but the government contends that the witnesses' lack of memory is "[i]mplicit in the context of their testimony." Appellee's

---

[1]This dialogue took place with respect to the first witness who testified about notes she took at the seminars. The government laid a similar foundation, establishing that the notes were taken contemporaneously with the event, for the other two witnesses whose notes were also admitted as exhibits.

(Dazey) Br. 31.

Unfortunately, it is difficult to discern from the record exactly how much the witnesses remembered about what they heard at the seminars. The government's examination generally takes the form of a running commentary on the notes. The prosecutor points to a particular phrase in the notes and asks what it means, and the witness explains the notation and elaborates on what Dr. Craft or Mr. Dazey said on that topic. It is clear that the witnesses retained some independent memory of what was said, and none of the witnesses actually stated that he or she could not recollect any particular aspect of the seminars. In similar situations, courts have held that it is error for the district court to admit evidence under Rule 803(5) without a showing that the witness lacks sufficient memory to testify fully. *See Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998); *United States v. Felix-Jerez*, 667 F.2d 1297, 1301-02 (9th Cir. 1982).

Even if the district court erred in admitting the notes without a proper foundation, such an error does not require reversal of the appellants' convictions if it is harmless. A decision to admit evidence is harmless unless a substantial right of a party is affected. Fed. R. Evid. 103(a). An error affecting a substantial right is one which had a "substantial influence" on the trial's outcome or which creates a "grave doubt" as to whether it had such effect. *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (quoting *Kotteakos v. United*

*States*, 328 U.S. 750, 765 (1946)).

We are convinced that the district court's decision to admit the notes did not have a substantial influence on the outcome of the trial. In so concluding, we acknowledge that the content of the pitch delivered by Mr. Dazey and Dr. Craft at the seminars was an important part of the government's case against Mr. Dazey. The government sought to show that Mr. Dazey's role at the seminars was to stimulate investments in Wealth-Mart by hyping international investment opportunities of the sort that Wealth-Mart offered and presenting himself as an international man of financial mystery with inside contacts and special access to the international banking system. The notes supported this claim, because the witnesses jotted down some of the dizzying stream of financial jargon that Mr. Dazey presented to the audience. Nevertheless, there was a sufficient supply of properly admitted evidence about what Mr. Dazey said at the seminars to make the additional evidence contained in the notes immaterial.

First, the note-takers themselves provided substantial evidence, from memory, about Mr. Dazey's presentations, describing them generally as explanations of investment opportunities in international bank-related instruments. Second, several other witnesses testified from memory about Mr. Dazey's presentations and described them in terms consistent with the notes. Some even provided additional specific details, such as Mr. Dazey saying he

executed the trading by which the Wealth-Mart investment made money, that he had worked for the Nixons and Rockefellers and helped to make their fortunes, and that he wore an ankle bracelet when traveling overseas so that the international financial movers and shakers would always know where he was. Tr. 939-941. Finally, Mr. Dazey himself testified about his participation at the seminars in Colorado, summarizing his remarks as a presentation on:

> the international banking system as it relates to the issuance of different types of debenture or credit instruments.
> Going back to the understanding of what I was trying to do in the factoring concept of buying mid-term notes, working through securities traders, things of this nature, was an opportunity to simply point out the opportunity of international factoring in different types of commercial paper, whether it be standby letters or letters of credit or whatever.

Tr. 2208-09. This learned discourse is, at least to our untrained minds, substantially similar to the way Mr. Dazey's remarks were characterized in the notes. Mr. Dazey also admitted that he talked about "prime bank guarantees" at the seminars. Moreover, Mr. Dazey introduced as an exhibit his own notes, from which he delivered his lectures, and these contain references to "bank debenture trading programs" and other terminology consistent with Wealth-Mart's program. Tr. 2213-16; Defendant Exh. 64, 65. In sum, there was so much additional evidence about the nature of Mr. Dazey's seminar presentations that the addition of the notes almost certainly did not affect the outcome of the trial.

Any error in admitting the notes was also harmless as to Dr. Craft. The

-30-

content of Dr. Craft's speeches at the seminars was much less important to the case against him than Mr. Dazey's speeches were to Mr. Dazey's case. As noted in Part II(A)(1) above, the evidence against Dr. Craft was overwhelming. Among all the evidence showing that Dr. Craft was the operational leader and charismatic force behind the Wealth-Mart program, evidence showing that he praised the program at the Colorado seminars added little. Moreover, several witnesses, including the note-takers, testified from memory about the essentials of Dr. Craft's presentations. The inclusion of the notes therefore could not have affected the outcome of the trial.

Appellants also point out that the district court should not have admitted the notes into evidence as exhibits. Under Rule 803(5), even if the proper foundation had been laid to admit the notes as a past recollection recorded, the notes should have been read into evidence and not received as an exhibit. The only rationale discernible to us for requiring that notes be read aloud into the record rather than received into evidence is so that the "past recollection recorded" evidence is treated on par with the oral testimony presented at trial. Otherwise, the jury might, in its deliberations, tend to privilege the notes that it gets to take into the jury room over the oral testimony that might already be half-forgotten. In this case, the likelihood that the jury overemphasized the notes, simply because they were admitted as exhibits rather than read aloud at trial, was

vanishingly small.  The notes themselves, without the accompanying testimony of the note-takers, are fairly inscrutable.  Some of the handwriting is illegible, and even where the words are discernible, they mostly form sentence fragments whose meaning is less than obvious.  Moreover, this is not a case where the jury was sitting in the jury room with nothing but the erroneously admitted notes in front of them.  During the trial, the court admitted hundreds of documents as exhibits.  The government's exhibits fill twenty three-ring binders.  It is difficult to imagine that the jury, awash as it was in a flood of documentary exhibits, improperly focused on a few pages of difficult to discern notes at the expense of the rest of the evidence presented at trial.

### E.  Admission of Lulling Letters and other Documents

Appellant Griffith challenges the district court's admission of letters, emails, and recorded telephone calls between Ms. Griffith and various investors.  The parties refer to these communications as "lulling letters," because they generally take the form of Ms. Griffith attempting to reassure concerned investors that they would get their money back.  *See United States v. Trammell*, 133 F.3d 1343, 1352-53 (10th Cir. 1998) (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)) (defining "lulling letter" as a communication "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant . . . less likely").  Ms.

Griffith maintains that these communications were not probative of her criminal intent because she made them more than a year after Wealth-Mart had stopped soliciting investments and because she disclosed to some of the investors that the FBI was investigating Wealth-Mart. According to Ms. Griffith, the communications' probative value was therefore outweighed by the danger of unfair prejudice, and the district court should have excluded them under Federal Rule of Evidence 403.

The district court did not abuse its discretion in admitting the communications. The communications were relevant to the jury's consideration of whether Ms. Griffith knew that Wealth-Mart was a fraud. The fact that Ms. Griffith was constantly fending off frustrated investors' calls and letters with increasingly implausible excuses was probative of whether she was knowingly defrauding people or innocently following orders from Dr. Craft. The communications do not lose that relevancy simply because Ms. Griffith made them after Wealth-Mart stopped soliciting investors or because she acknowledged an FBI investigation. Moreover, Ms. Griffith has not explained how the evidence raised the danger of *unfair* prejudice, as opposed to simply asserting that the evidence harmed her defense.

Ms. Griffith also challenges the admission of evidence regarding a civil securities fraud suit. At trial, the government moved for admission of a civil

securities fraud complaint that some Wealth-Mart investors filed against Dr. Craft and Ms. Griffith. Defense counsel objected, and the district judge called all counsel to the bench to discuss the objection. Tr. 1697. Dr. Craft's counsel did not want the complaint itself admitted because its allegations were unsubstantiated, but offered to stipulate to the facts that Dr. Craft and Ms. Griffith had been sued for securities fraud, had been served with the complaint, and that a default judgment had been entered against Dr. Craft. Tr. 1698. The government and Ms. Griffith's counsel agreed to the stipulation. *Id*. The district judge then suggested that the government could implement the stipulation by withdrawing its request to admit the documents in exchange for being allowed to ask the witness (an FBI agent) questions about the lawsuit to elicit only the stipulated facts. Tr. 1699-1700. The judge asked whether that arrangement was satisfactory to everyone, and no one objected. Tr. 1700. The agent then testified to the stipulated facts only, saying nothing about the details of the suit's allegations.

On appeal, Ms. Griffith challenges the admission of the civil securities fraud petition on confrontation clause grounds. The district court, however, did *not* admit the petition. Instead, the only facts that the jury heard about the securities fraud suit were the facts to which defense counsel stipulated. Defense counsel's stipulation to admission of evidence effectively waives the defendant's

confrontation rights unless the defendant can show that the waiver constituted ineffective assistance of counsel. *United States v. Aptt*, 354 F.3d 1269, 1284 (10th Cir. 2004). Ms. Griffith has made no such showing.

Finally, Appellant Griffith contends that the district court should not have permitted cooperating witness Denise Jones to testify that she heard Ms. Griffith and others at Wealth-Mart devising a plan to induce complaining investors to "re-enter" their money into the program in order to buy themselves more time. Although defense counsel did not object at trial, Ms. Griffith argues that the testimony was inadmissible hearsay and highly prejudicial and that it was plain error to allow it. However, the challenged testimony appears to be statements of Ms. Griffith herself and other co-conspirators made in furtherance of the conspiracy, and if so the statements are not deemed to be hearsay and are admissible. *See* Fed. R. Evid. 801(d)(2)(E). The district court therefore did not plainly err in admitting the testimony.

### F. Closing Arguments

Mr. Craft and Ms. Griffith claim they were denied due process because of various improper comments that the United States Attorney made during his closing argument. When trial counsel lodges no objection at trial to the prosecutor's comments, we review claims of prosecutorial misconduct during closing argument for plain error. *United States v. May*, 52 F.3d 885, 887 (10th

-35-

Cir. 1995).

In his closing argument, the prosecutor referred to the tape-recorded December 17, 1997 meeting, at which Dr. Craft spoke and Ms. Griffith was present. At the meeting, Dr. Craft insisted that employees should characterize customers' relationship with Wealth-Mart as a money management contract rather than an "investment." Using the magic word "investment" would cross into the "gray area of SEC or security . . . entities and they don't need much more than that to come swoopin' in." Appellee's (Griffith) App. 20. Dr. Craft went on: "Now they can be stopped. Now we have done it a half a dozen times in the last eighteen months. But it always cost money, it cost time, it cost effort." *Id.*

The United States Attorney argued that these references to potential SEC investigations supported an inference that Dr. Craft and Ms. Griffith were aware that Wealth-Mart was a fraud. Appellants Craft and Griffith contend that the prosecutor's argument takes the reference to the SEC out of context and exaggerates its importance. This may be so, but questions of context and emphasis are what opening and closing statements are about. The prosecutor is entitled to argue to the jury that it should draw reasonable inferences from the evidence to support the government's theory of the case. *United States v. Espinosa*, 771 F.2d 1382, 1402 (10th Cir. 1985) (holding that the prosecutor at closing argument is free to make fair comment on the evidence and draw

reasonable inferences from it). One of the central issues at trial was whether Dr. Craft and the other defendants knew that Wealth-Mart was defrauding its investors. The fact that Dr. Craft told employees that they needed to take steps to stop the SEC from "swoopin' in" because the SEC had already tried to swoop in six times is relevant to what Dr. Craft and those employees thought about Wealth-Mart's legitimacy. It would not be unreasonable for the jury to conclude that the defendants' concerns about the SEC supported the finding that they were aware that their business was fraudulent. The prosecutor was therefore entitled to make this argument to the jury. If defense counsel believed Dr. Craft's SEC remarks were unimportant or subject to a different interpretation, he was free in his turn to make such arguments to the jury in his own closing statements.

The appellants also argue that the prosecutor improperly commented on their failure to testify at trial. The prosecutor said

> I'm not going to try to cover all of the evidence. You all were obviously paying attention. You know what the evidence is. You don't need me to merely repeat what the defendants have said – I mean, what the victims and the other witnesses have said.

Tr. 2478. Although a prosecutor may not comment on a defendant's failure to testify, "we will not consider a statement improper in this respect unless it was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Espinosa*, 771 F.2d at 1402 (quoting *United States v.*

*Bennett*, 542 F.2d 63, 64 (10th Cir.1976), *cert. denied*, 429 U.S. 1048 (1977)) (internal quotation marks omitted).  The prosecutor's remark was most likely inadvertent, he corrected himself immediately, and no reasonable jury would interpret it as a comment on the defendants' failure to testify.

The appellants allege that the prosecutor made various other improper statements during closing argument, including an allegedly improper reference to a civil securities fraud suit against Ms. Griffith, an improper argument that Ms. Griffith's role in the re-entry program suggests she knew Wealth-Mart was a fraud, and an improper suggestion that juries should convict the defendants in order to express society's condemnation of fraud. All of these remarks were fair comments on the evidence or on the jury's role and, in any event, none of them was sufficiently egregious or prejudicial to warrant reversal under the plain error standard of review.

## G.  Expert Testimony

At trial, the government called an expert witness, Herb Biern, a senior official at the Federal Reserve Board, to testify about prime bank frauds. Mr. Biern testified that he had led inter-agency efforts to combat prime bank frauds for the past decade and that such frauds are very common.  Mr. Biern told the jury that there is no such thing as a "prime bank" and that the secret trading markets that prime bank fraudsters promote do not exist.  He

explained some of the characteristic "hallmarks" of prime bank frauds, including references to the secret markets of international banks, promises of unrealistically high returns, use of technical-sounding financial jargon in a nonsensical way, and an emphasis on secrecy. Mr. Biern also testified that the Wealth-Mart bank debenture trading program, as described in a government exhibit, did not exist.

Appellants Craft and Griffith contend that the district court abused its discretion in allowing Mr. Biern's testimony on the ground that it "invaded the province of the jury." Appellant's (Craft) Br. 41. It is somewhat unclear what Appellants mean by this contention, because the Federal Rules of Evidence allow an expert to offer opinion evidence even when it "embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). However, an expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment. *See United States v. Simpson*, 7 F.3d 186, 188-89 (10th Cir. 1993). Expert testimony of this sort is sometimes excluded on the ground that it "usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law." *Id*. at 188. We therefore interpret the appellants' argument as contending that the

district judge should have excluded Mr. Biern's testimony on this basis.

We review a trial court's admission of expert testimony for abuse of discretion, and we will reverse only when that decision is "manifestly erroneous." *Id.* In addition, erroneous admission of expert testimony that does not affect substantial rights and results in actual prejudice is deemed harmless and does not warrant reversal. *A.E., By and Through, Evans v. Independent School District No. 25*, 936 F.2d 472, 476 (10th Cir. 1991). Under this standard of review, we must reject the appellants' claim. Mr. Biern's testimony did not simply tell the jury to reach a particular verdict based on his own say-so. Rather, he carefully explained the source of his extensive knowledge of prime bank frauds and explained what attributes these schemes, in his considerable experience, often share. Although he also opined that any investment program using the word "prime bank" was a fraud and that the Wealth-Mart trading program did not exist, he did not directly testify that any particular defendant actually violated the law. Even if his testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the jury's judgment. *See Specht v. Jensen*, 853 F.2d 805, 808-09 (10th Cir. 1988).

Finally, any error in admitting the testimony was harmless, because

none of the defendants questioned the expert's conclusion that there was no secret prime bank trading program. No one contended that Wealth-Mart was actually legitimate. The appellants' defenses focused instead on their alleged lack of knowledge of the fraudulent nature of Wealth-Mart, and Mr. Biern's direct testimony did not offer an opinion on the defendants' knowledge or lack thereof.

On cross-examination, defense counsel asked whether he thought someone who recruited investors for a prime bank scheme might herself have been duped and genuinely believed in the scheme. Mr. Biern conceded that it was possible, but hard for him to believe. Tr. 839-40. On appeal, Appellants Craft and Griffith object to this testimony, but any error was invited by defense counsel's question. *See Evans*, 936 F.2d at 477 (holding that any error prompted by a direct question from defense counsel is harmless).

### H. Mr. Mathew's Sentence

Mr. Mathew argues that the district court should have granted him a two-level reduction for acceptance of responsibility. Mr. Mathew acknowledges that he put the government to its burden of proof at trial. Nevertheless, he argues that this should not count against him because he was acquitted of the securities fraud charges at trial. He also points out

that, before being indicted, he and his lawyer provided information to the government while they were negotiating the possibility of Mr. Mathew's pleading guilty and testifying for the government. Although those negotiations fell through, Mr. Mathew asserts that his attempts to cooperate manifested his acceptance of responsibility.

Whether the facts of a particular case warrant a reduction for acceptance of responsibility is a question of fact that we review under the clearly erroneous standard. *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004). "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, cmt. n.5. The district judge denied Mr. Mathew's motion for an acceptance of responsibility reduction based on the logical ground that Mr. Mathew had not accepted responsibility: "I am fairly familiar with the case and I know that the defendant has never actually admitted any guilt in this case." Appellee's (Mathew) App., Vol. 2, 218. Mr. Mathew has not demonstrated that this finding was clearly erroneous. He has not pointed to any record evidence showing that he admitted guilt or accepted any responsibility whatsoever for the millions of dollars that were stolen from investors. Indeed, he continues to insist on appeal that there was

insufficient evidence to convict him on all counts. We therefore see no basis for overturning the district court's determination.

Mr. Mathew also challenges the district court's determination of the amount of loss. At sentencing, the district court applied a 15-point enhancement to the base offense level on the ground that the loss was over $10 million. At the sentencing hearing, Mr. Mathew's attorney agreed that a loss figure over $10 million was appropriate, based upon documents that Mr. Mathew himself had introduced at trial:

> Your honor, based upon Defendant's Exhibit 18 that was introduced at trial, I can't validly object to the amount of loss figure, because the documents reflect an $11 million figure, so as relates to that number, Your Honor, I believe whatever objection that is, we would have to agree that that's the appropriate amount.

Appellee's (Mathew) App., Vol. 2, 215. Mr. Mathew has failed to demonstrate that it was clearly erroneous for the district court to find a loss amount that was reflected in the defendant's own exhibits and which was agreed to by defense counsel.[2]

## I. Blakely, Booker & Plain Error

After oral argument, Mr. Dazey moved to file a supplemental brief

---

[2] Mr. Mathew has not filed any motions with this Court challenging his sentence under *Blakely v. Washington*, 124 S.Ct. 2531 (2004), perhaps because trial counsel, by agreeing to the loss figure, may have waived Mr. Mathew's rights under *Blakely*. *See id*. at 2541 (explaining that a defendant may waive *Blakely* rights by stipulating to relevant facts).

arguing that his sentence was invalid under *Blakely v. Washington*, 124 S.Ct. 2531 (2004). We granted that motion and now consider his argument in light of the Supreme Court's ruling in *United States v. Booker*, 125 S. Ct. 738 (2005).

The jury found Mr. Dazey guilty of one count of conspiracy to commit fraud, 18 U.S.C. § 371, ten counts of wire fraud, *id.* § 1343, and one count of money laundering, *id.* § 1957. During sentencing, the district court found the following facts that were not established by the jury's verdict: (1) that the loss attributable to Mr. Dazey's role in the conspiracy was more than $7 million (a 20 level enhancement under the Sentencing Guidelines); (2) that there were fifty or more victims of the scheme (a 4 level enhancement); and (3) that Mr. Dazey obstructed justice (a 2 level enhancement). Using these judge-found facts, the district court determined Mr. Dazey's offense level to be 32. Mr. Dazey's criminal history category of I and his offense level of 32 provided for a sentencing range of 121-151 months. *See* U.S.S.G. Ch. 5 Pt. A. The court sentenced Mr. Dazey to the bottom end of the range, 121 months. Mr. Dazey argues, and the government does not contest, that the judge-found facts increased the his sentence beyond the maximum

authorized by the jury's verdict.[3]

Though Mr. Dazey contested the evidentiary basis of the judge-found facts, he did not assert at trial that use of the Sentencing Guidelines violated the Constitution. Because Mr. Dazey did not raise this issue below, we review the district court's sentencing decision for plain error. *United States v. Gonzalez-Huerta*, No. 04-2045, slip op. at 7 (10th Cir. 2005) (en banc)*; United States v. Hurlich*, 348 F.3d 1219, 1220 (10th Cir. 2003); *cf. Booker*, 125 U.S. at 769 ("[W]e expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test.").

---

[3] It is not possible to determine the exact offense level authorized by the jury's verdict because the indictment does not specify an amount of loss attributable to Mr. Dazey's involvement in the conspiracy. A defendant convicted of conspiracy is accountable for conduct that was in furtherance of the conspiracy and was reasonably foreseeable in connection with the criminal enterprise. U.S.S.G. § 1B1.3(a)(1)(A). The commentary to this guideline explains that when a conspiracy count is worded broadly "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same for every participant." *Id.* § 1B1.3 n. 2.

The conspiracy count in this case, which jointly indicts five individuals, is written at a general level and does not contain sufficient detail to determine the amount of loss that Mr. Dazey could reasonably foresee. Accordingly, we cannot determine the maximum sentence authorized by the jury verdict with precision. Nevertheless, the substantial 20 level enhancement for the amount of loss determined by the district court, as well as the enhancements for the number of victims and obstruction of justice (neither of which were alleged in the indictment), make it clear that the district court's fact finding increased the Mr. Dazey's maximum sentence beyond the range established by the jury's verdict.

To establish plain error, Mr. Dazey must demonstrate that the district court (1) committed error, (2) that the error was plain, and (3) that the plain error affected his substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002); *Gonzalez-Huerta*, slip op. at 7. If all these conditions are met, a court reviewing the error may exercise discretion to correct it if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Cotton*, 535 U.S. at 631-32; *Gonzalez-Huerta*, slip op. at 8. We conduct this analysis "less rigidly when reviewing a potential constitutional error." *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001).

**1. Error**

The district court committed constitutional error in sentencing Mr. Dazey. In *Booker*, the Court extended the logic of *Blakely* to the Federal Sentencing Guidelines, holding that the Sixth Amendment requires that "[a]ny fact (other than a prior conviction) . . . necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 U.S. at 756. To remedy this constitutional infirmity created by applying judge-found facts to mandatory sentencing guidelines, the Court severed the provision of the

-46-

Sentencing Reform Act making application of the Guidelines mandatory. *Id.* at 756 (excising 18 U.S.C. § 3553(b)(1)). In Mr. Dazey's case, the district court, applying the then-mandatory Guidelines, relied on three facts that the judge found by a preponderance of the evidence to increase his sentence beyond the maximum authorized by the facts established by the jury's verdict. This sentencing methodology violated Mr. Dazey's Sixth Amendment rights.

The constitutional nature of this error distinguishes Mr. Dazey's case from cases such as *Gonzalez-Huerta* or *United States v. Trujillo-Terrazas*, No. 04-2075 (10th Cir. 2005), in which the sentence was based entirely on facts found by the jury, admitted by the defendant, or the fact of a prior conviction. *See Gonzalez-Huerta*, slip op. at 6 (distinguishing between "constitutional *Booker* error" and "non-constitutional *Booker* error"). Such cases involve no violation of constitution and no misinterpretation of operative statutes; they are "error" only in the sense that they violate the remedial reconstruction of the Sentencing Reform Act performed by the *Booker* Court. Because the error in sentencing Mr. Dazey was constitutional, we relax our analysis on the remaining elements of plain error review. *See James*, 257 F.3d at 1182.

**2. Plain**

The error here is plain.  To be plain, an error must be "clear or obvious" under "current, well-settled law."  *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000).  An error is plain "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal."  *Johnson v. United States*, 520 U.S. 461, 468 (1997).  That is the situation here.  The district court sentenced Mr. Dazey in accordance with law that was well-settled at the time, which we know now was in error.  *See Gonzalez-Huerta*, slip op. at 8.

**3. Affects Substantial Rights**

The more difficult question is whether the constitutional error in Mr. Dazey's case affects his substantial rights.  For an error to have affected substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings."  *United States v. Olano*, 507 U.S. at 725, 734 (1993); *see Gonzalez-Huerta*, slip op. at 8-9.  The burden to establish prejudice to substantial rights is on the party that failed to raise the issue below.  *United States v. Vonn*, 535 U.S. 55, 63 (2002); *Olano*, 507 U.S. at 734-35; *Gonzalez-Huerta*, slip op. at 8-9.

To demonstrate that the mandatory application of the Guidelines to facts that a judge found by a preponderance of the evidence affected substantial rights, a defendant must show a "reasonable probability" that the

defects in his sentencing altered the result of the proceedings. *See U.S. v. Dominguez Benitez*, 124 S.Ct. 2333, 2339 (2004) ("In cases where the burden of demonstrating prejudice . . . is on the defendant seeking relief, we have invoked a standard . . . requiring the showing of 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'") (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).

In a case of constitutional *Booker* error,[4] there are at least two ways a defendant can make this showing. First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected his substantial rights. This inquiry requires the appellate court to review the evidence submitted at the sentencing hearing and the factual basis for any objection the defendant may have made to the facts on which the sentence was predicated. Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the

---

[4] Obviously, in a case of non-constitutional *Booker* error, only the second of these possibilities is available, and the standard is applied more rigorously.

-49-

sentencing factors of 18 U.S.C. § 3553(a),[5] the district court judge would reasonably impose a sentence outside the Guidelines range. For example, if during sentencing the district court expressed its view that the defendant's conduct, based on the record, did not warrant the minimum Guidelines sentence, this might well be sufficient to conclude that the defendant had shown that the *Booker* error affected the defendant's substantial rights.

We do not agree with the apparent conclusion of some other courts that the mere difference between the imposed Guidelines sentence and the sentence the defendant would have received based on the facts found by the jury, admitted by the defendant, or based on the fact of a prior conviction, is sufficient to satisfy the third prong of plain error. *See United States v. Hughes*, No. 03-4172, slip op. at 14 (4th Cir. March 16, 2005); *United States v. Oliver*, 397 F.3d 369, 379-80 (6th Cir. 2005). If the defendant is unable to show a reasonable probability that either the factual predicate for sentencing would be different if the district court were not required to sentence on the basis of judge-found, preponderance-of-the-evidence facts,

---

[5] Section 3553(a) requires sentencing courts to take account of factors such as the "the nature and circumstances of the offense and the history and characteristics of the defendant", 18 U.S.C. § 3553(a)(1), the range suggested by the Guidelines, *id.* § 3553(a)(4), and the need for sentencing uniformity for defendants with similar criminal histories and found guilty of similar conduct, *id.* § 3553(a)(6).

or that the ensuing sentence would be different if the court were entitled to greater latitude in considering the sentencing factors of 18 U.S.C. § 3553(a), there is no basis for concluding that the error affected his substantial rights. The analytical error committed by the courts that have reached the opposite conclusion, we believe, is to treat the use of any use of extra-verdict enhancements as constitutional *Booker* error. *See, e.g., Hughes*, slip op. at 17-21 (refusing to consider the remedial scheme contemplated by *Booker* to determine whether Sixth Amendment error affected substantial rights); *Oliver*, F.3d at 379-80. The error, instead, is the use of extra-verdict enhancements in a mandatory guidelines system. *See United States v. Rodriguez*, 398 F.3d 1291, 1300-01 (11th Cir. 2005). To determine prejudice to substantial rights, we must compare the actual sentence to the sentence the defendant would have received under an "effectively advisory" guidelines system—not to the sentence he would have received solely on the basis of the facts found by a jury, admitted by the defendant, or based on prior convictions.[6]

---

[6] Two circuits have suggested that their approach is compelled by the fact that the Supreme Court remanded in *Booker* without questioning whether the defendants' substantial rights were affected. *Hughes*, slip op. at 20-21; *United States v. Milan*, 398 F.3d 445, 453-54 (6th Cir. 2005). The simple answer to this is that the government did not raise the plain error issue in *Booker*, and the Court had no reason to consider it.

While Mr. Dazey does not point to any evidence that the judge believed that the Guidelines range was excessive in light of the facts found by the court, he does argue that there was insufficient evidence for the jury to find the sentence-enhancing facts that the judge found by a preponderance of the evidence. Mr. Dazey contends there was not sufficient evidence for a jury to conclude that he was responsible for the entire $14 million loss attributable to the Wealth-Mart scheme. He argues that the jury's verdict does not establish that he was responsible for over $7 million in losses and the evidence submitted at trial demonstrated that only $2.2 million ended up in his bank accounts.

A defendant convicted of conspiracy is accountable for reasonably foreseeable conduct in furtherance of the jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3(a)(1)(A). However, a defendant's accountability only extends to the criminal activity that he agreed to undertake. *See id.* § 1B1.3 n.2. This means "proper attribution at sentencing requires . . . particularized findings about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole." *United States v. Melton*, 131 F.3d 1400, 1404 (10th Cir. 1997) (internal quotation marks omitted). In the context of a conspiracy to defraud, we have held that a defendant is accountable for the

entire loss created by a fraudulent organization if the defendant played a major role in the organization and the losses were reasonably foreseeable. *See United States v. Osborne*, 332 F.3d 1307, 1311-12 (10th Cir. 2003). If the defendant's role in the conspiracy was less substantial, then particularized findings about the defendant's agreement to join the conspiracy must support the scope of the defendant's role in the conspiracy. *See Melton*, 131 F.3d at 1406. Moreover, a defendant is not accountable for the conduct of members of a conspiracy "prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." U.S.S.G. § 1B1.3 n.2.

At sentencing, Mr. Dazey strenuously contested the factual basis for the sentencing enhancements, presenting evidence that he did not play a central role in the Wealth-Mart scheme and did not reasonably foresee the full scope of the fraudulent activity. His principal role in the scheme was as an actor: he appeared at investor "seminars" in the guise of Wealth-Mart's international trader and lectured the guests about the profits to be had from investing. There is no evidence that he participated in any of Wealth-Mart's day-to-day business meetings or operations, received investments, handled finances, or participated in overall management. His name does not appear on Wealth-Mart documents or confidentiality agreements. On the other

-53-

hand, the government stresses that Mr. Dazey had somewhat regular phone contact with Dr. Craft, was a speaker at Wealth-Mart seminars, and received over $2 million of investor funds in his bank account. While this inculpatory evidence was more than sufficient to satisfy the old, clearly erroneous standard, the question of what a jury would have concluded using a reasonable doubt standard is closer.

In light of the constitutional nature of the error, we are compelled to conduct this analysis "less rigidly" than we would otherwise. *James*, 257 F.3d at 1182. Taking the requisite, "less rigid[]" approach appropriate to constitutional error, we conclude there is a reasonable probability that a jury evaluating the evidence presented at trial would not determine, beyond a reasonable doubt, that Mr. Dazey could reasonably foresee the full extent of investor losses. *Cf. United States v. Turner*, 400 F.3d 491, 500 (7th Cir. 2005) (remanding a sentence to correct constitutional *Booker* error where the defendant was one of fifteen people listed on an indictment for a money laundering conspiracy, but the jury's guilty verdict and the evidence presented were insufficient for the district court to conclude that the defendant was accountable for the entire amount of money laundered by the conspiracy).

We further conclude there is a reasonable probability that if the

district judge had not thought himself bound by the mandatory Guidelines to sentence in accordance with these judge-found, preponderance-of-the-evidence facts, he might have determined that Mr. Dazey's conduct warranted a sentence below that prescribed for losses of more than $7 million. In the post-*Booker* world, district courts are accorded greater latitude to determine sentences in light of the "seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A). District courts might reasonably take into consideration the strength of the evidence in support of sentencing enhancements, rather than (as in the pre-*Booker* world) looking solely to whether there was a preponderance of the evidence, and applying Guidelines-specified enhancements accordingly. We therefore hold that Mr. Dazey has met his burden of establishing that the mandatory 20 point enhancement, based on a judicial finding that he was responsible for all the losses inflicted by Wealth-Mart, affected his substantial rights.[7]

---

[7] Mr. Dazey also maintains that the district court's finding that there were more than 50 victims was based on hearsay. While sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability, *United States v. Shewmaker*, 936 F.2d 1124, 1129 (10th Cir. 1991), juries may not consider this type of evidence. However, use of this hearsay evidence, by itself, does not violate Mr. Dazey's substantial rights. Under *Booker*, district courts must "consider the Guidelines ranges," *Booker*, 125 S. Ct. at 757, and nothing in the Supreme Court's opinion suggests that the evidentiary basis for Guidelines determinations (now that they are "effectively advisory") has changed in any way. Mr. Dazey has supplied no reason, other than the hearsay

(continued...)

**4. Integrity, Fairness, or Public Reputation**

If a plain error affects the integrity, fairness, or public reputation of judicial proceedings, it is in the discretion of the reviewing court to correct the error. *Johnson v. United States*, 520 U.S. 461, 467 (1997). In an instance of non-constitutional error the standard for satisfying the fourth prong of the plain error test is demanding. *See Dominguez Benitez*, 124 S. Ct. at 2335. A party that fails to raise an argument in the district court must show that allowing a non-constitutional error to stand would be "particularly egregious" and would constitute a "miscarriage of justice." *United States v. Gilkey*, 118 F.3d 702, 704 (10th Cir. 1997). In the context of an alleged constitutional error, the relaxed standard means we do not require the exceptional showing required to remand a case of non-constitutional error. Nevertheless, the defendant still bears the burden of showing that an exercise of our discretion is appropriate. *United States v. Olano*, 507 U.S. 725, 734 (1993); *Gonzalez-Huerta*, slip op. at 18.

We believe there are at least three reasons to support the exercise of our discretion to correct this plain error. First, the error in this case was

---

[7](...continued)
nature of the evidence, to doubt that there were at least 50 victims, and he has thus failed to show a reasonable probability that any Sixth Amendment error involving this enhancement affected his substantial rights.

constitutional in nature, which entails a less rigorous application of the plain error review burden. *See United States v. Jefferson*, 925 F.2d 1242, 1254 (10th Cir. 1991). Unlike the error in non-constitutional cases, which is purely the result of the Supreme Court's choice of remedy, *Gonzalez-Huerta*, slip op. at 20, Mr. Dazey's sentence was the result of a violation of his Sixth Amendment rights.

Second, Mr. Dazey does not merely speculate that, if the district court had understood it had discretion, it might have exercised leniency. Rather, Mr. Dazey vigorously contested the judge-found facts that enhanced his sentence. This distinguishes Mr. Dazey's case from our cases holding that *Blakely/Booker* violations are not plain error when the defendant did not dispute a judge's factual findings that led to an increase in his sentence, even though, in such a case, the district court could have exercised its discretion to reach a different sentence. *See United States v. Maldonado-Ramires*, 384 F.3d 1228, 1231 n.1 (10th Cir. 2004); *cf. Gonzalez-Huerta*, slip op. at 19-24 (finding, in a case of non-constitutional *Booker* error, that the fourth prong was not satisfied). The strength of the evidence supporting Guidelines enhancements was not relevant to the mandatory results under the pre-*Booker* regime (provided the evidence satisfied the preponderance standard); now, in the discretion of the district

court, it may be.  *See* 18 U.S.C. § 3553(a)(2)(A) (requiring sentencing court

to consider, inter alia, the "seriousness of the offense").

Third, the judge-found facts in this case substantially increased Mr.

Dazey's sentence under the Guidelines.  In *Booker*, the Court noted that the

significant divergence between the sentence authorized by the jury's verdict

and the sentence imposed after judicial fact-finding demonstrates the extent

to which the right to have a jury find facts has atrophied.  *Booker*, 125 S.Ct.

at 751 (describing an increase of ten years as "very serious").  That

divergence is present here.  The judge-found fact that Mr. Dazey was

responsible for over $7 million in losses authorized a sizable 20 level

enhancement of his offense level.[8]  While *Booker* permits this approach to

sentencing, allowing a substantial increase in Mr. Dazey's sentence through

the now-suspect practice of mandatory enhancements, based on judge-found

facts, runs the risk of impugning the integrity and reputation of judicial

proceedings.

We do not necessarily believe all constitutional *Booker* errors that

---

[8] As noted above, it is not possible to precisely determine Mr. Dazey's offense level authorized by the jury's verdict due to the broad wording of the indictment.  For that reason we cannot precisely determine the increase in Mr. Dazey's sentence attributable to judicial fact finding.  Nevertheless, the 20 level enhancement authorized by the judicially-found fact ensures that the district court's sentencing methodology produced a significantly longer sentence than that permitted by the jury's verdict.

affect substantial rights also undermine the integrity, fairness, or public reputation of judicial proceedings. However, Mr. Dazey received a substantial enhancement on the basis of judge-found facts that he contested at the sentencing hearing, and he has demonstrated a reasonable likelihood that, applying proper post-*Booker* standards, the outcome might have been significantly different. For these reasons, we believe this plain error warrants our exercise of discretion to remand the case.

### III. CONCLUSION

For the foregoing reasons, all Appellants' convictions and Mr. Mathew's sentence are **AFFIRMED**. Mr. Dazey's sentence is **AFFIRMED** as to all arguments raised in his initial brief, but is **VACATED** in light of *Booker*. The case is **REMANDED** to the district court for resentencing in accordance with that decision.