**F I L E D**

**UNITED STATES COURT OF APPEALS**

**June 8, 2005**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PAUL BENNETT,

    Defendant - Appellant.

No. 03-1524
(D. Colorado)
(D.Ct. No. 00-CR-53-N)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, **LUCERO**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Paul Bennett pled guilty to possession with intent to distribute five grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) and to possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). He was sentenced to 248 months imprisonment. He appeals both his sentence[1] and the district court's ruling on his motion to suppress.[2] Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we AFFIRM.

## I. Factual Background

On February 3, 2000, a state judge issued a search warrant for a residence owned by Paul Bennett at 5565 Yuba Way in the City and County of Denver, Colorado. The warrant, based on an affidavit filed by Detective James D. Caffrey of the Lakewood Police Department, authorized a search for evidence of methamphetamine manufacture. The affidavit, ten pages in length and single-spaced, recounted the investigation into Bennett's activities in great detail. Highlights included the following:

On January 20, 2000, Amy Castle told an undercover agent of the Drug Enforcement Administration (DEA) that she was a supplier of precursor

---

[1] After initial briefing, Bennett moved for leave to file a supplemental brief on the grounds his sentence was invalid under *United States v. Booker,* -- U.S.-- , 125 S.Ct. 738 (2005). We granted the motion.

[2] Bennett entered a conditional plea of guilty, reserving the right to challenge on appeal the district court's denial of his motion to suppress. *See* FED. R. CRIM. P. 11(a)(2).

chemicals to methamphetamine manufacturers or "cooks," one of whom had been manufacturing methamphetamine for thirty years. Later the same day, she was observed transporting precursor chemicals to the residence of Chadwick New, then nineteen years of age. Shortly thereafter, New left his residence and was tailed to a pharmacy. Before entering the pharmacy, he was observed discarding several bags into a trash bin. In these bags, recovered by law enforcement, were 186 empty blister packs that once contained 6,288 cold tablets of pseudoephedrine (used in the production of methamphetamine). Based on the foregoing, Detective Caffrey obtained a search warrant for New's residence to search for evidence of methamphetamine possession and manufacture.

On January 27, 2000, Castle was arrested after she purchased a pound of ephedrine from a chemical supplier. She informed Detective Caffrey she was awaiting New's return from a trip to Vermont before delivering the ephedrine to him; she purchased precursor chemicals for New and others; she always delivered the chemicals to New at his residence; New was involved with others in the manufacture of methamphetamine; and she was paid in methamphetamine and cash for her services.

When New's residence was searched pursuant to the search warrant, agents discovered in his bedroom extensive evidence of methamphetamine manfacture and sale, including precursor chemicals. Confronted with this discovery, and with

a warrant issued for his arrest for methamphetamine manufacture, New agreed to cooperate with law enforcement.

On February 1, 2000, New informed agents he purchased precursor chemicals for methamphetamine manufacture and delivered them to Paul Bennett. The chemicals New provided to Bennett included those provided to New by Amy Castle. New was paid for his services in cash or methamphetamine. According to New, Bennett was forty to fifty years old, claimed to be a chemist by trade and was the main "cook" in the organization. New informed Detective Caffrey that Bennett operated a fully-equipped methamphetamine laboratory in the basement of a home Bennett owned. New described the various components of the laboratory in great detail. New stated Bennett's house had security cameras installed on the exterior to monitor people in the vicinity. Other "cooks" also used Bennett's methamphetamine laboratory. They compensated Bennett by giving him a percentage of their product. New indicated he had been in Bennett's house and had assisted in manufacturing methamphetamine. He had also observed Bennett manufacture methamphetamine in the basement laboratory. New stated he delivered two to three hundred boxes of pseudoephedrine to Bennett each week.

On February 2, 2000, New took agents, including Detective Caffrey, to the house containing the methamphetamine laboratory. Its address was 5565 Yuba

Way in the City and County of Denver, Colorado. The front door had an iron bar across it and security cameras scanned the entrance. There were high intensity lights in the back yard. The next morning, New made a controlled delivery of precursor chemicals (including 500 milliliters of hypophosphorous acid and 500 grams of iodine) to Bennett at the Yuba Way address while Agents surveilled the delivery from outside Bennett's residence. New was in the residence for approximately half an hour.

After leaving Bennett's residence, New informed Detective Caffrey he had delivered the precursor chemicals to Bennett, who paid New $240.00 as partial payment. During the visit to Bennett's house, New observed the operational methamphetamine laboratory in the basement. He also saw a woman named Tina, to whom he had previously delivered pseudoephedrine for use in the manufacture of methamphetamine in the basement laboratory, removing pseudoephedrine from blister packs. Tina and Bennett informed New they were awaiting delivery of additional pseudoephedrine in order to begin a "cook." Tina asked New if he would be able to supply additional pseudoephedrine, and New responded he would do so.

New advised that while he was at Bennett's residence he also observed a taxicab driver arrive and remove bags of chemical waste resulting from the methamphetamine manufacturing process. According to New, Bennett adopted

this method of waste management to avoid detection of his illegal operation by law enforcement. The officers who surveilled New's controlled delivery of precursor chemicals to Bennett in the early morning hours of February 3, 2000, simultaneously observed this taxicab driver collect several bags from the residence and depart.

Based on the foregoing, together with abundant additional information contained in the affidavit, on February 3, 2000, the state court judge issued a search warrant for Bennett's house at 5565 Yuba Way. Executed the same day, the search uncovered numerous items evidencing the manufacture and sale of methamphetamine, including 5.9 grams of actual methamphetamine, 601.8 grams of pseudoephedrine, 1,058 grams of iodine and several weapons. Bennett was arrested.

## II. Procedural Background

On September 21, 2000, Bennett entered his conditional guilty plea. The court set sentencing for December 8, 2000. Pending sentencing, while on bond, Bennett absconded. He was re-arrested in Arizona on February 13, 2003, and finally sentenced on December 4, 2003.

The Presentence Investigation Report (PIR) prepared by the U.S. Probation Office set a base offense level of 34 based, initially, on a quantity of 472.3 grams of actual methamphetamine (5.9 grams of actual methamphetamine seized and

466.4 grams of actual methamphetamine based on the productive capability of the precursor chemicals seized).[3] *See* United States Sentencing Commission, *Guidelines Manual*, §2D1.1(c)(3) (2003) (base offense level of 34 applies where quantity of actual methamphetamine is at least 150 grams but less than 500 grams). *See also* USSG §2D1.1, comment. (n.12) ("Where . . . the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider . . . the size or capability of any laboratory involved."). In addition, the PIR adjusted the base offense level upward two levels for obstruction of justice under USSG §3C1.1. *See id.*, comment. (n.4(e)) (adjustment applies to "escaping or attempting to escape from custody before trial or sentencing; or wilfully failing to appear, as ordered, for a judicial proceeding"). The guideline sentence for a violation of 18 U.S.C. § 924(c) is the statutory minimum term of imprisonment, five years. *See* 18 U.S.C. § 924(c)(1)(A)(I) and (c)(1)(D)(ii) (term of imprisonment shall be consecutive to other terms of imprisonment imposed). *See also* USSG §2K2.4 (accord). With a total offense level of 36 and a Criminal History Category of I, the guideline range was 188 to 235 months imprisonment

---

[3] The productive capabilities of the precursor chemicals were estimated in DEA Summary Laboratory Reports. After a sentencing hearing conducted on November 14, 2003, and as a result of a misunderstanding by the DEA chemist as to the amount of iodine seized from Bennett's house, the PIR was amended prior to final sentencing to reflect a productive capability of 275.1 grams.

on the drug trafficking offense. Bennett objected to the PIR drug quantity calculation under USSG §2D1.1(c) insofar as it depended on the productive capability of the precursor chemicals seized.

At a sentencing hearing conducted on November 14, 2003, experts testified to the productive capability of Bennett's methamphetamine laboratory based on the precursor chemicals seized, in particular the iodine. At the continued sentencing hearing on December 4, 2003, the court, relying on the Government's expert witness, found the productive capability of Bennett's lab was 275.1 grams of actual methamphetamine. Added to the 5.9 grams of actual methamphetamine seized at Bennett's house, this resulted in 281 grams of actual methamphetamine. The quantity calculation again resulted in a base offense level of 34.

The court also found Bennett obstructed justice by absconding before sentencing, and, as a result, enhanced the base offense level an additional two levels under USSG §3C1.1. Bennett did not contest the obstruction of justice finding or enhancement. The court declined to downward depart for acceptance of responsibility, see USSG §3E1.1, or for any other reason. *See* USSG §5K2.0; 18 U.S.C. § 3553(b) (allowing departures under specified conditions but since excised by *United States v. Booker,* -- U.S. -- , 125 S.Ct. 738, 756 (2005)). With a total offense level of 36 and a Criminal History Category of I, the court sentenced Bennett to 188 months on the drug trafficking violation (the low end of

the guideline range) and imposed a consecutive 60 months for the firearms violation, for a total of 248 months.  In rendering its sentence, the court stated:

> I find no reason to depart from the sentence called for by application of the guidelines in this case.  Because of the guideline range of 24 months, I am required to state a reason for imposing a sentence at a particular point and range.  In determining each component, I determined the nature and circumstances of the offense and history and characteristics of the Defendant.

> With respect to imprisonment, I find that the term of imprisonment is required.  I will impose the minimum term in this case, because I find that the minimum term is sufficient to achieve the statutory purposes of the sentence of incarceration, including the need for the sentence imposed to reflect the seriousness with respect to the law and provide just punishment for the offense, for deterrence, and to protect the public from further crimes of the Defendant.

(R. Vol. II at 17-18.)

### III.  Discussion

### A.  The Search

Bennett contends the search warrant issued on February 3, 2000, was not supported by probable cause and, as a consequence, the district court should have suppressed the fruits of the search.  In particular, he contends the affidavit in support of the search warrant contained little to bolster New's reliability.  The district court rejected this argument.  So do we.

> In upholding the reasonableness of the search, the district court stated:

> The affidavit is extraordinarily detailed, but the central question really is the credibility of the informant and whether in light of that question, there is probable cause in the affidavit.

-9-

I find that there is sufficient corroboration and sufficient information for . . . the judge, the state judge, to conclude that the informant was telling the truth when he related this information.

The affidavit sets forth corroboration of information the informant had given about the operation generally. There is some cross corroboration of information with other individuals. There is independent corroboration of a good deal of the information, and there is corroboration of what happened specifically on the evening in question.

(R. Vol. III at 70.)

We review *de novo* the district court's determination of reasonableness under the Fourth Amendment, but defer to its factual findings if they are not clearly erroneous, viewing the evidence in the light most favorable to the government. *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001). We accord great deference to the probable cause finding of a magistrate who issues a search warrant. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). In doing so, we apply a totality of the circumstances test:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed.

*Id.* at 238-39 (quotation marks omitted).

"[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced

-10-

to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons." *Id.* at 232. Probable cause does not denote a *prima facie* case of criminal activity, but only the probability of it. *Id.* at 235 (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). To be sure, an "informant's statement [must be] reasonably corroborated by other matters within the [affiant's] knowledge[,]" *id.* at 242 (quotation marks omitted), but "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Id.* at 234.[4]

With these principles in mind, and after a careful review of the record, we harbor no doubt the search warrant, based on the totality of the circumstances recited in the affidavit, soundly rests on probable cause. We agree with the district court's analysis. We have gone to great lengths to recount the highlights of Detective Caffrey's affidavit because, even un-amplified by the balance of the affidavit, they plainly support issuance of the warrant. Amplified by the balance of the affidavit, which we see no need to recount in detail, the case for probable

---

[4] In *Gates*, the Court considered probable cause based on an anonymous informant's statement. *See Gates,* 462 U.S. at 225. However, we construe its observations on the weight to be accorded an informant's statement as generically applicable to all informants, including one whose identity, as in this case, is revealed in an affidavit for a search warrant.

cause is clear cut and strong. New's statements to law enforcement were sufficiently corroborated by the context of the entire investigation and, in particular, by the controlled transaction in which he delivered precursor chemicals to Bennett on February 3, 2000. We therefore decline relief to Bennett in his challenge to the district court's denial of his motion to suppress the fruits of the search.

## B.    *The Sentence*

The statutory sentence of imprisonment for a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) (possession with intent to distribute five grams or more of methamphetamine) is not less than five nor more than forty years. For a violation of 18 U.S.C. § 924(c)(1) (possession of a firearm in furtherance of a drug trafficking crime), the statutory sentence of imprisonment is not less than five years, mandated to run consecutively to any other term of imprisonment. Bennett's sentence of 288 months (24 years) imprisonment is, therefore, within the statutorily authorized punishment. Bennett claims, however, that judicial fact-finding of drug quantity to enhance his sentence for drug trafficking, *see* USSG §2D1.1(c)(3), violates *Booker* and requires remand for resentencing.[5]

---

[5] In his Supplemental Brief, Bennett suggests *Booker* is also implicated by the failure of the district court to downward depart for acceptance of responsibility. *See* USSG §3E1.1. We do not agree. *Booker* only applies to instances where a sentence exceeds that which is authorized by the jury's verdict or the defendant's admissions. *Booker,* 125 S.Ct. at 756.

In *Booker*, the United States Supreme Court extended its ruling in *Blakely v. Washington*, -- U.S.--, 124 S.Ct. 2531 (2004), to invalidate the federal sentencing guidelines under the Sixth Amendment insofar as they were mandatory.[6] 125 S.Ct. at 745. It held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. The Court concluded the guidelines would not offend the Constitution if advisory only. *Id.* at 749-50. To this end, in the remedial portion of its opinion, the Court excised those provisions mandating their application. *Id.* at 756-57. The Court indicated its decision was applicable to all cases, like this one, on direct review. *Id.* at 769.

Applying *Booker,* we have stated:

---

[6] In *Blakely*, the Court applied its decision in *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") to invalidate, under the Sixth Amendment, application of Washington's sentencing guidelines. In *Blakely*, the sentencing court enhanced a standard sentence under these guidelines. The facts necessary to support the enhancement were neither admitted by the defendant nor proven to a jury beyond a reasonable doubt. Even though the enhanced sentence did not exceed the statutory ceiling of imprisonment for the offense, the Court invalidated it. *Blakely,* 124 S.Ct. at 2538. In doing so, the Court clarified that "the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 2537 (quotation marks and emphasis omitted).

there are two distinct types of error that a court sentencing prior to *Booker* could make. First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. As a matter of convenience, we will refer to such an error as a constitutional *Booker* error. Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. While this type of sentence does not violate the Sixth Amendment, such a sentence is nonetheless impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines. We will refer to this second type of error as a non-constitutional *Booker* error.

*United States v. Gonzalez-Huerta,* 403 F.3d 727, 731-32 (10th Cir. 2005) (quotation marks and citations omitted). Irrespective of the type of error involved, *Booker* does not necessitate a remand for resentencing in all instances. Instead, "reviewing courts [are] to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the plain-error test." *Booker,* 125 S.Ct. at 769 (quotation marks omitted).

Bennett concedes, and the Government agrees, that the alleged error was unpreserved in the trial court and review is for plain error. We enjoy discretion to notice plain error. *See* FED. R. CRIM. P. 52(b). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta,* 403 F.3d at 732 (internal quotation marks

-14-

omitted). "We conduct this analysis less rigidly when reviewing a potential constitutional error." *United States v. Dazey,* 403 F.3d 1147, 1174 (10th Cir. 2005) (internal quotation marks omitted).

The Government concedes judicial fact-finding in the quantity calculation and also concedes the error was plain. *See United States v. Clifton,* 406 F.3d 1173, 1181 (10th Cir. 2005) ("Non-constitutional and constitutional *Booker* errors satisfy the first two prongs of the plain-error test."). We therefore conclude Bennett's claim is one of constitutional *Booker* error, and we limit our review to the third and, if necessary, the fourth prong of the plain error test.

"Satisfying the third prong of plain-error review--that the error affects substantial rights--usually means that the error must have affected the outcome of the district court proceedings." *Gonzalez-Huerta,* 403 F.3d at 732 (quotation marks omitted). It is the defendant's burden to make this showing, even in a case of alleged constitutional error. *Id.* at 733. "To meet this burden, the appellant must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* (quotation marks omitted).

> In a case of constitutional *Booker* error, there are at least two ways a defendant can make this showing. First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected his substantial rights. This inquiry requires the appellate court to review the evidence submitted at the sentencing hearing and the factual basis for any objection the

-15-

defendant may have made to the facts on which the sentence was predicated. Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range.

*Dazey,* 403 F.3d at 1175 (footnotes omitted).

Applying these principles, we review the facts related to the drug quantity calculation.[7] We first inquire whether there is a reasonable probability that a jury, applying a reasonable doubt standard, would not have found, as did the judge applying a preponderance of the evidence standard, that the productive capability of Bennett's lab exceeded 150 grams of actual methamphetamine. Although the judge found the productive capability was 275.1 grams of actual methamphetamine, an amount in excess of 150 grams of actual methamphetamine is all that is needed under the guidelines for a base offense level of 34. *See* USSG §2D1.1(c)(3). Therefore, the "*material fact[] that [the] judge found by a preponderance of the evidence,*" *Dazey,* 403 F.3d at 1175 (emphasis added), was

---

[7] Bennett admitted in his plea agreement and in the plea proceeding that "[j]ust over 6 grams of actual manufactured methamphetamine were found in the basement." (R. Vol. I, Docket Entry 136 at 5.) To be more exact, the DEA Summary Laboratory Report indicated the actual methamphetamine content of the methamphetamine seized in the basement was 5.9 grams. With Bennett's admission, this amount is beyond *Booker* challenge. *See Booker,* 125 S.Ct. at 756. A quantity of 5.9 grams of actual methamphetamine, standing alone, results in a base offense level of 26. *See* USSG §2D1.1(c)(7). The addition of a two-level enhancement for obstruction of justice, *see* USSG §3C1.1, results in a total offense level of 28. With a Criminal History Category of I, this, without more, would have resulted in a guideline range of 78-97 months.

that the productive capability of the laboratory was at least 150 grams of actual methamphetamine.

In conducting our inquiry, we consider the evidence adduced at the sentencing hearing on November 14, 2003, and objections made by Bennett at the sentencing hearing on December 4, 2003. Our inquiry requires a rudimentary understanding of the pseudoephedrine reduction method of manufacturing methamphetamine employed in this case, which we have divined from the record. First, pseudoephedrine is extracted from cold medications. It is then mixed with iodine, a re-agent. While there are other stages to the manufacturing process, it is important to understand this: assuming sufficient quantities of pseudoephedrine (not contested here), the amount of iodine available to the process limits the amount of actual methamphetamine that can be produced.

At the sentencing hearing on November 14, forensic chemists testified for the Government and Bennett. On behalf of the Government, Keith Chan of the DEA testified that he was provided with samples of the iodine seized from Bennett's basement. Prior to his testimony, DEA Agent Todd Wheeler, who was involved in the iodine's seizure, testified to the protocol for handling and disposing of chemicals seized at a methamphetamine laboratory:[8]

---

[8] The protocol did not apply to pseudoephedrine because it is a controlled substance and not considered a hazardous material.

The chemicals used in the production of these controlled substances, in this case methamphetamine, are sampled, and the samples are sent to our laboratory for analysis. And the remaining quantities are then provided to a contract company for destruction under hazardous waste due to the possibility of contamination, exposure, spills, things that could happen to the full quantity of chemicals if they were maintained.

(R. Supp. Vol. III at 7-8.) In the case of the iodine seizure, he testified agents seized and photographed three one-pound containers of iodine. At the time, he estimated two containers to be full and one container to be one-third full.[9] This information was conveyed to Chan, who converted the estimates to a total of 1,058 grams. In addition, a sample from each container was provided to Chan for chemical analysis. The balance of each container was destroyed pursuant to protocol.

Chan testified that in his professional opinion the productive capability of 1,058 grams of iodine was 275.1 grams of actual methamphetamine. He explained:

This type of method of making amphetamine with red phosphorous and iodine is one of the more simplest [*sic*] ways of producing methamphetamine. It is what we call one-pot process. That is everything, the precursor, re-agent are dumped into a pot or reaction vessel, a little heat is applied, end [*sic*] the result is methamphetamine. The whole process can probably be done within two days from initial precursor to final product. In my experience we have had – we run across high school student[s] performing the same reaction.

_____

[9] Bennett's counsel rigorously cross-examined Agent Wheeler on his estimates of the volume of iodine contained in the three one-pound containers.

(R. Suppl. Vol. III at 53.) He added his estimate of productive capability of the iodine seized from Bennett's laboratory was a conservative one. Furthermore, unless the methamphetamine produced was adulterated, Chan testified it could achieve a purity close to 100 percent.[10]

On Bennett's behalf, Dr. Robert Lanz, a chemist employed by Rocky Mountain Metallurgic Laboratories in Fort Collins, Colorado, testified that while a skilled chemist could produce near-pure methamphetamine using uncontaminated raw materials, as Chan had suggested, these conditions are not always present and can result in the production of methamphetamine of reduced purity. He was unable to state the volume of precursor chemicals that would have been necessary to produce the 5.9 grams of actual methamphetamine seized from Bennett's laboratory. He indicated he would not be able to estimate, to a reasonable degree of scientific certainty, the weight of the iodine in the containers seized from the laboratory. Finally, he testified it is not possible to theorize to a reasonable degree of scientific certainty, as Chan did, the productive capability of a precursor chemical such as iodine. While Dr. Lanz suggested it might be possible to arrive at what he described as a "theoretical yield," based on the volume of precursor chemicals, when pressed on cross-examination for an

---

[10] Chan testified the purity of the methamphetamine seized from Bennett's laboratory was ninety-seven percent for one portion weighing .95 grams and ninety-four percent for a portion weighing 5.4 grams.

estimate of "reasonably expected yield," based on the evidence in the case, he maintained there were too many unknown variables and declined to offer an opinion. (R., Supp. Vol. III at 71-72.) At the sentencing hearing on December 4, 2003, Bennett's counsel built on Dr. Lanz's testimony and argued Chan's methodology for calculating the productive capability of the laboratory was simply too imprecise in light of the multiple variables involved – in particular the possibility of contaminated precursor chemicals and adulteration of the product.

Bennett certainly challenged the estimate Agent Wheeler provided to Chan of the volume of each of the one-pound containers of iodine seized from Bennett's laboratory, the methodology Chan employed in calculating productive capability of the iodine and the certainty of the variables Chan employed in his calculations insofar as contamination and adulteration were concerned. But, these challenges were not so potent, individually or collectively, to merit a conclusion on our part that there is a reasonable probability a jury, applying a reasonable doubt standard, would conclude the productive capability of the laboratory was less than 150 grams.[11]

Nor has Bennett met his burden to demonstrate a reasonable probability

_____

[11] It would require a diminution in excess of forty-five percent off of the Government's projected productive capability of 275.1 grams of actual methamphetamine to reduce the productive capability of Bennett's laboratory beneath the 150 grams of actual methamphetamine necessary to engage a base offense level of 34. The sum of the evidence does not merit such a diminution.

that, under the specific facts of his case as analyzed under the sentencing factors

of 18 U.S.C. § 3553(a),[12] the district court would have reasonably imposed a

---

[12]  **Factors to be considered in imposing sentence**.  The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider –

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed –
        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B)    to afford adequate deterrence to criminal conduct;
        (C)    to protect the public from further crimes of the defendant; and
        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for
        (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

    (5)    any pertinent policy statement –
        (A)    issued by the Sentencing Commission . . . .

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

sentence outside the guideline range under a post-*Booker* advisory regime.  The

court's comments in declaring sentence clearly evidence it determined Bennett's

sentence in at least partial reliance on § 3553(a)'s standards.  After *Booker's*

excision of the mandatory application of the guidelines, *see* 125 S.Ct. at 756-57,

these standards hold even greater sway.  Even so, we can identify nothing in the

record or in any argument by Bennett to suggest the court would have sentenced

differently in the absence of the provision mandating application of the

guidelines.[13]  In fact, the court specifically stated the 188 month term of

imprisonment was appropriate, and it declined to depart downward for any reason.

We acknowledge the authority to downward depart, pre-*Booker*, was limited under

§ 3553(b), but still, there is absolutely no indication in the record the court was

open to any departure at all, whether legitimate grounds could be advanced or not.

Therefore, we conclude judicial fact-finding of the productive capability of

the laboratory did not affect Bennett's substantial rights under the third prong of

the plain error test.  This being so, we need not consider whether he satisfies the

fourth prong of the test.  We determine Bennett has failed to satisfy the plain

---

(7)     the need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a).

[13] Bennett does not claim *Booker* error based on the district court's enhancement for obstruction of justice. *See* USSG §3C1.1.  Bennett did not challenge the enhancement in either his sentencing or his initial appellate briefs.  This is not surprising, inasmuch as the facts of Bennett's flight and non-appearance for sentencing were patent and without valid excuse.

error standard.

## IV. Conclusion

Accordingly, we AFFIRM the judgment of the district court.


**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge