**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 14, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

JOHN G.G. KREGAS,

  Defendant - Appellant.

No. 03-1435
(D. Colorado)
(D.Ct. No. 03-CR-92-M)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, **LUCERO**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

John G.G. Kregas was convicted of making a false statement and aiding and abetting the same in violation of 18 U.S.C. §§ 2 and 1014. He was sentenced to

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

twenty-one months imprisonment. Kregas appeals arguing his sentence is unconstitutional under *Blakely v. Washington*, 124 S.Ct. 2531 (2004)[1]. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I. Factual Background

In 1995, Kregas, Roger Howard and Pierre Coleman formed Online Marketing Solutions (Online) in Colorado.[2] In late 1996, Online began selling custom-made golf clubs under the name Executive Golf Unlimited.[3] The golf clubs were sold by telemarketers hired by Online. If a customer wished to buy the golf clubs, the telemarketer would record the customer's credit card information and transfer this information to Online for processing. Initially, Online used other companies to process its credit card sales. However, because these companies charged Online for this service, Kregas and Howard decided they wanted to obtain their own merchant account.[4] Therefore, in early 1997, Howard

[1]We also consider the impact of *United States v. Booker*, 125 S.Ct. 738 (2005). *See infa,* n. 18.

[2] Kregas served as President, Howard as Vice-President, Coleman as Secretary and Buck Whatley as Treasurer. However, Online employees considered Kregas and Howard to be "in charge" of the company.

[3] Online sold a full set of golf clubs for approximately $1,000, a set of woods for $650 and a set of irons for $350. Originally, the clubs were manufactured by an individual in Arizona. However, because of their poor quality, Online eventually began assembling the clubs itself.

[4] A merchant account allows a company to accept credit cards from its customers. A company obtains a merchant account from a bank. When a credit card sale is made, the

contacted Brian Bourjaily, an independent sales representative of credit card processing services, who referred Howard to Luke Anastasakis, the owner of Merchant Services International (Merchant Services), a company that assists merchants in obtaining credit card processing capabilities.

Anastasakis and Bourjaily determined they would obtain Online's merchant account through Northeast Merchant Services (NEMS), an Independent Sales Organization[5] associated with Chittenden Bank (Chittenden) in Vermont. They provided Howard with a merchant account application. NEMS rejected Online's initial application because Kregas, the sole signer/guarantor, had insufficient credit. Therefore, NEMS provided Online with a new application, instructing it that someone with sufficient credit involved with the company would have to sign it.

In February 1997, Online submitted a second application to NEMS. The

cardholder's bank issues an authorization stating the account is in good standing and there is sufficient credit for the purchase. Once an authorization is received, the bank holding the company's merchant account credits that account and the money is then automatically transferred into the company's checking account (called an operating account) for the company's use. The bank may also require the company to set-up a reserve account, which is initially funded by the company. In addition to this initial deposit, the reserve account is continually funded with a certain percentage of the company's credit card sales. The purpose of the reserve account is to cover any chargebacks that may occur which the company cannot cover with its operating account.

[5] The term Independent Sales Organization was formulated by VISA to describe an organization which is not a bank but is associated with a bank to provide credit card processing services.

second application was signed by Kregas and identified him as Online's President and a twenty percent shareholder. The application also contained the forged signature of Jessica Onesty, Howard's mother-in-law, and falsely indicated Onesty was Online's "CEO" and a thirty-one percent shareholder. The application's personal guarantee form bore Kregas' signature and Onesty's forged signature.[6] Based on Onesty's credit-worthiness, NEMS approved the application and forwarded it to Chittenden.[7] Chittenden in turn approved the application, conditioned on Online opening a reserve account with a minimum deposit of $10,000 and an operating account. On March 10, 1997, Chittenden sent a letter addressed to Kregas informing him of its conditional approval and enclosing a reserve account agreement and a signature card for the operating account. Kregas signed the reserve account agreement and he and Howard signed the operating account's signature card. The agreement and card were returned to Chittenden

---

[6] Chittenden's underwriting guidelines required at least fifty-one percent of a company's ownership to guarantee a merchant account. If the company became liable to Chittenden and could not pay, Chittenden held the guarantors personally liable.

[7] Online also provided NEMS with copies of Kregas' and Onesty's driver's licenses, its 1996 tax return and its financial statements. Both the tax return and financial statements overstated Online's financial situation. Specifically, the financial statements falsely indicated Online had five million in assets, and the tax return (which was never filed with the IRS) stated Online had gross receipts/sales of $3,206,122 in 1996. The tax return was signed by Kregas and also contained the forged signature of "R.J. Clark C.P.A." (R. Vol. VI at 433.) Clark testified at trial, stating he knew Kregas because Clark's wife and Kregas' mother were good friends. He testified he never prepared or signed the 1996 tax return.

along with a $10,000 check signed by Kregas to be deposited into the reserve account.

Thereafter, Chittenden opened a merchant account for Online, and Online began processing its credit card sales through this account. Each credit card sale resulted in a credit to the account. Once it entered the merchant account, the amount of the sale was immediately transferred to Online's operating account, which was a checking account. Once the money was deposited into its operating account, Online would wire the money to its bank in Colorado for its use.[8] Between March 26, 1997, and April 10, 1997, Online authorized a series of wire transfers from its operating account to its Colorado bank. All of the wire transfer authorizations contained Kregas' signature but only a few of them were actually signed by him, the remainder having been signed by other Online employees.

Beginning in June 1997 and continuing through September 1997, Online began receiving a number of chargebacks[9] due to non-delivery or unacceptability of its golf clubs and its failure to issue refunds.[10] In response to these chargebacks,

---

[8] Although Chittenden required Online to have an operating account, it did not require it to use that account to pay its bills.

[9] A chargeback occurs when a credit card holder disputes a transaction and requests his credit card company to investigate and obtain a refund. In essence, when a chargeback occurs, it reverses the process that took place at the time of the credit card sale.

[10] Online provided a ninety-day refund policy on its golf clubs.

Chittenden debited Online's operating account, eventually resulting in an overdraft to the account. One of NEMS's owners, Aaron Dewar, contacted Howard and Kregas concerning the situation. Dewar informed them NEMS would be attempting to recover the money from the guarantors on the merchant account application. In response, Kregas "vehemently" stated he did not want NEMS contacting Onesty.[11] (R. Vol. V at 283.)

Chittenden eventually closed Online's merchant account. As a result of the chargebacks and Online's inability to cover them, Chittenden lost approximately $320,785.64.

## II. Procedural Background

On February 25, 2003, Kregas and Howard were charged by indictment with knowingly making a false statement and report for the purpose of influencing Chittenden to approve Online's merchant account application and aiding and abetting the same in violation of 18 U.S.C. §§ 2 and 1014.[12] Specifically, the indictment alleged Kregas and Howard falsely indicated on the merchant account application that Onesty was Online's CEO and that she personally guaranteed the

---

[11] Dewar testified Kregas was "very anxious that we not contact [Onesty] and he said it very forcefully." (R. Vol. V at 283-84.)

[12] The six-year delay between the offense and indictment was due to the fact that the case originated as a telemarketing fraud investigation by the City of Aurora Police Department based on customer complaints concerning Online. The case was eventually turned over to the FBI and the focus of the investigation turned to the merchant account application.

-6-

performance of the merchant account. On May 21, 2003, the government re-charged Howard with conspiracy to make a false statement and report for the purpose of influencing Chittenden to approve Online's merchant account application. Howard pled guilty and was sentenced to fifteen months imprisonment. Kregas proceeded to trial on July 7-10, 2003.

At trial, Onesty testified she never signed the merchant account application, never agreed to serve as a guarantor of the merchant account, was not Online's CEO, did not own Online stock and never provided her driver's license to anyone at Online.[13] Beverly Mazur, a Questioned Documents Examiner for the City of Aurora Police Department, testified she compared Onesty's signature on the application with her known signature and concluded the signature on the application was a simulation of her actual signature. However, Mazur could not determine who forged Onesty's signature, including whether Kregas was the forger. Several individuals familiar with Kregas' handwriting testified the merchant account application contained Kregas' handwriting and Kregas himself admitted he completed most of

_____

[13] On February 11, 1997, Onesty did co-sign with Online on a car lease for a Ford Explorer. The vehicle was to be used by both Howard and his wife Diedra (Onesty's daughter). Onesty testified she met Kregas and another individual at the car dealership to consummate the lease. While there, Onesty provided the salesperson with her driver's license in order for him to make a copy of it. When the transaction was completed, the salesperson provided Onesty with a set of the lease's paperwork which she in turn gave to Kregas. Although she assumes a copy of her driver's license was contained within that paperwork, she did not see it. With this testimony, the government attempted to create an inference that Kregas had access to a copy of Onesty's driver's license.

the application, albeit at Howard's direction. Stacey Baldwin, the Online Marketing employee who witnessed the signatures on the application, testified Onesty's signature was not on the application at the time she signed as a witness and in fact, the space where Onesty's signature appeared was blank. In explaining the blank signature line, Baldwin stated Kregas told her he had forgotten a signature and would have Coleman (Online's Secretary) sign it. Tye Walton, another Online Marketing employee, testified Kregas had admitted to him that he had signed Onesty's name to the application. Eileen Smith, the Chittenden underwriter who approved Online's second application, testified she would not have approved the application if Onesty had not been listed as a personal guarantor because Kregas' credit history did not meet the bank's standards.[14]

Kregas testified in his own defense and attempted to shift the blame to Howard. During his testimony, he denied signing Onesty's name on the application.

---

[14] The government also presented Rule 404(b) evidence which included several Online business documents containing forged signatures. One of these documents, a commercial credit application for the rental of office furniture, contained the forged signature of William H. Pelham, Howard's wife's great-uncle. Coleman (Online's Secretary) testified he heard Kregas admit to signing Pelham's name on the application, and Buck Whatley (Online's Treasurer) testified he saw a copy of Pelham's driver's license in Kregas' office. Whatley also testified Kregas had performed computer work for Pelham at Pelham's home, thereby implying that Kregas had access to Pelham's personal information. At trial, Kregas denied signing Pelham's name on the furniture rental application. Another document, an application for an electronic funds transfer account with eFunds Corporation, contained Onesty's name and personal information (In fact, Onesty's name was misspelled on the form as "Honesty.") The individual who set up this account for Online, Joseph Bertucci, testified he dealt with Kregas in setting it up.

He testified Howard had asked Onesty to co-sign on the merchant account and that Onesty had agreed. He further stated that at the time the application was being completed, Howard was in the process of making Onesty "CEO" of Online and a thirty-one percent owner. Although he admitted to filling out the application, he stated he provided the completed application to Howard and told Howard to get Onesty to sign it. He also denied ever preparing or submitting the false financial statements and 1996 tax return to NEMS.

The jury found Kregas guilty. A presentence investigation report (PSR) was prepared.[15] Applying USSG §2F1.1(a), the guideline applicable for a violation of 18 U.S.C. § 1014, the probation officer determined Kregas' base offense level was 6. However, because the amount of loss to Chittenden was between $200,000 and $350,000, the officer increased the base offense level by eight levels pursuant to USSG §2F1.1(b)(1)(I). The officer also added two levels pursuant to USSG §2F1.1(b)(2) because the offense involved more than minimal planning. Based on a total offense level of 16 and a criminal history category of I, the probation officer calculated the guideline range as twenty-one to twenty-seven months imprisonment. He also recommended Kregas be ordered to make restitution in the amount of $171,015.52 to Chittenden, $1,355.97 to NEMS and $148,414.15 to Merchant

---

[15] Kregas was sentenced pursuant to the 1995 edition of the United States Sentencing Guidelines Manual to avoid any *ex post facto* issues. All citations to the guidelines in this opinion refer to the 1995 guidelines unless otherwise indicated.

Services.[16]

Kregas raised several objections to the PSR. First, he argued that the evidence at trial demonstrated that most of the wire transfer authorizations Online submitted to Chittenden were not actually signed by Kregas. Because the authorizations actually signed by Kregas only totaled $110,000, Kregas alleged the net loss to Chittenden as a result of his "relevant conduct" was $100,000 (after crediting the $10,000 deposit made to the reserve account). Thus, Kregas argued his base offense level should only be increased six levels pursuant to USSG §2F1.1(b)(1)(G) (authorizing a six level increase if the amount of loss falls between $70,000 and $120,000). Kregas also objected to the PSR based on its failure to provide him with a three level reduction under USSG §3B1.2 based on his role in the offense, which he claimed to be between a minimal and minor role.[17] He argued that the evidence at trial established Howard was the individual responsible for setting up Online's merchant account and submitting the merchant account application to Chittenden. He further emphasized that the majority of the loss to Chittenden resulted from wire transfer authorizations submitted to Chittenden

---

[16] The record reflects Merchant Services reimbursed Chittenden for part of its loss. Apparently, NEMS also reimbursed Chittenden.

[17] USSG § 3B1.2(a) provides a four level reduction if the defendant was a minimal participant and USSG § 3B1.2(b) provides a two level reduction if the defendant was a minor participant. In cases falling between subsections (a) and (b), USSG § 3B1.2 provides for a three level reduction.

without Kregas' knowledge or consent. Lastly, Kregas sought a downward departure for aberrant behavior pursuant to USSG §5K2.20 based on his lack of a criminal history and his post-offense conduct (which included six years of continual self-employment and no criminal activity).

The district court rejected Kregas' arguments. As to the amount of loss, it noted Kregas was not objecting to the amount of restitution and concluded Kregas was responsible for the total amount of loss resulting from the merchant account's existence ($320,785.64), regardless of whether he signed the wire transfer authorizations. As to Kregas' role in the offense, the court did not agree it was minimal or minor and found Howard and Kregas had an "equal[]" role in completing and submitting the false merchant account application. (R. Vol. IX at 8.) The court also denied Kregas' request for a downward departure based on aberrant behavior. Adopting the recommendations in the PSR, the court sentenced Kregas to twenty-one months imprisonment. It also ordered Kregas to pay restitution in the amount of $320,785.64, to be paid jointly and severally with Howard. This appeal followed.

III. Discussion

Kregas asserts his sentence, imposed pursuant to the mandatory federal sentencing guidelines and enhanced pursuant to judge-found facts, violates the Sixth

Amendment under *Blakely* and *Booker*.[18]  Although Kregas raised sentencing

objections in the district court, those objections did not include a Sixth Amendment

violation.  Thus, we review for plain error.  *United States v. Dazey*, 403 F.3d 1147,

1173-74 (10th Cir. 2005) (holding that although the defendant contested at

sentencing the evidentiary basis of the judge-found facts, because he did not raise a

Sixth Amendment violation below, plain error review applied); *see also United*

*States v. Gonzalez-Huerta*, 403 F.3d 727, 730 (10th Cir. 2005) (en banc) (applying

plain error review due to defendant's failure to raise *Booker* in the district court).

To establish plain error, Kregas must demonstrate there is (1) error, (2) that is plain

and (3) the error affects his substantial rights.  *Dazey*, 403 F.3d at 1174; *Gonzalez-*

*Huerta*, 403 F.3d at 732.  If these three prongs are met, we may exercise our

discretion to correct the error if Kregas establishes "the error seriously affects the

fairness, integrity, or public reputation of judicial proceedings," i.e. the fourth prong

of plain error review.  *Dazey*, 403 F.3d at 1174; *see also Gonzalez-Huerta*, 403 F.3d

at 736-37.

---

[18] Kregas did not raise *Booker* in a formal brief.  However, on January 24, 2005, he filed a FED. R. APP. P. 28(j) letter citing two appellate court cases interpreting and applying *Booker* in his favor.   Although we normally do not consider arguments raised for the first time in a Rule 28(j) letter, *see United States v. Lindsey*, 389 F.3d 1334, 1335 n.1 (10th Cir. 2004), Kregas did raise the Sixth Amendment issue pursuant to *Blakely* in his opening and reply briefs.  This is sufficient to invoke the Sixth Amendment holding in *Booker* as well.  Consequently, we will apply the Sixth Amendment analysis of both *Booker* and *Blakely* to this case.

A. Defining the Error

In *Booker*, the Supreme Court extended its holding in *Blakely* to the federal sentencing guidelines, holding that the Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict [to] be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756. To remedy the constitutional infirmity of the guidelines, *Booker* invalidated their mandatory nature, requiring the district court to consult them in an advisory fashion. *Id.* at 756-57 (severing and excising 18 U.S.C. §§ 3553(b)(1), 3742(e)). In *Gonzalez-Huerta*, we determined there were two types of error a district court could commit prior to *Booker*. 403 F.3d at 731. The first, referred to as "constitutional *Booker* error," occurs when the district court relies upon judge-found facts (other than a prior conviction) to enhance a defendant's sentence mandatorily, a practice proscribed by the Sixth Amendment. *Id.* The second type of error, referred to as "non-constitutional *Booker* error," results when the district court applies the guidelines in a mandatory rather than advisory fashion, even though the resulting sentence was calculated based solely upon facts admitted by the defendant or found by a jury. *Id.* at 731-32. Because the parties dispute what type of error was committed below, we must first define the error.

Kregas asserts the error in this case was "constitutional *Booker* error" because

-13-

his sentence was enhanced based on the district court's fact-finding, specifically that the amount of loss was between $200,000 and $350,000 and the offense involved more than minimal planning. The government contends no Sixth Amendment violation occurred. It alleges the amount of loss was a legal determination, specifically, whether Kregas could be held responsible under the guidelines' relevant conduct provision (USSG §1B1.3) for those losses caused by the wire transfer authorizations signed by his co-workers. As to the enhancement for more than minimal planning, the government contends Kregas waived any *Blakely* argument by failing to make any objection to the enhancement at sentencing and not challenging it on appeal. In his reply brief, Kregas disagrees with the government's assertion that the amount of loss issue was a legal determination. He contends that in ascertaining the amount of loss under USSG §2F1.1, the district court was required to decide whether the actions of his co-workers in forging his signature to the wire transfer authorizations were "reasonably foreseeable" to him under the relevant conduct provision of USSG §1B1.3. Because "reasonable foreseeab[ility]" is a fact question, not a legal one, Kregas maintains the amount of loss enhancement was the result of judicial fact-finding and therefore, in violation of the Sixth Amendment.

As to the amount of loss enhancement, we agree with the government that no Sixth Amendment violation occurred. Kregas' objection at sentencing to the amount

-14-

of loss was based on his argument that he could only be held responsible for the amount of loss resulting from the wire transfer authorizations he signed. His argument was rejected based on the district court's legal interpretation of USSG §2F1.1 and §1B1.3. Specifically, the court determined it was "the existence of the account that resulted in the losses, whether he sent the wire transfer authorizations or not." (R. Vol. IX at 8.) Although Kregas attempts to rely on the "reasonable foreseeab[ility]" language in the guidelines' relevant conduct provision, this language pertains to cases involving jointly undertaken criminal activity. *See* USSG §1B1.3(a)(1)(B) ("[I]n the case of a jointly undertaken criminal activity . . . [relevant conduct includes] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."). However, as the Commentary to §1B1.3 states: "The requirement of reasonable foreseeability applies only in respect to the conduct . . . of others under subsection (a)(1)(B). It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes; such conduct is addressed under subsection (a)(1)(A)." USSG §1B1.3, comment. (n. 2). Here, Kregas was convicted of personally aiding and abetting the submission of the false application to Chittenden. Therefore, as the district court legally concluded, §1B1.3(a)(1)(A), rather than §1B1.3(a)(1)(B), was the pertinent "relevant conduct" provision and Kregas was responsible for the total amount of loss to Chittenden

resulting from the merchant account, which was obtained solely due to the submission of the false application. Kregas admitted this loss was $320,785.64. (*See* R. Vol. I, Doc. 68 at 3; Vol. IX at 7.) Consequently, no Sixth Amendment violation resulted concerning the amount of loss because an eight-level enhancement under USSG §2F1.1(b)(1)(I) was authorized by the guilty verdict and Kregas' admissions.

Additionally, no Sixth Amendment violation occurred as to the more than minimal planning enhancement.[19] In this case, if the two-level enhancement for more than minimal planning had been omitted from the court's guideline calculations, the applicable offense level would have been 14, resulting in a guideline range of fifteen to twenty-one months imprisonment. Kregas received a twenty-one month sentence—a sentence the district court could have imposed without the more than minimal planning enhancement. Therefore, no constitutional error occurred as a result of this enhancement. *See United States v. Yazzie*, 407 F.3d 1139, 1144 (10th Cir. 2005) (en banc) ("*Booker* made clear that it is the actual sentence, not the sentencing range, that must not be increased based upon judge-

---

[19] Contrary to the government's argument, Kregas has not waived a *Blakely/Booker* challenge to the more than minimal planning enhancement. That he failed to object to this enhancement at sentencing based on the Sixth Amendment does not constitute a waiver; rather, his failure to preserve the issue at the district court limits our review to plain error. Also, Kregas' *Blakely* argument on appeal applied to both the amount of loss and more than minimal planning enhancements.

found facts in order to violate the Sixth Amendment . . . .").

Although there was no Sixth Amendment violation in this case with respect to the amount of loss and more than minimal planning enhancements, the district court did apply the guidelines in a mandatory fashion. Therefore, the district court committed "non-constitutional *Booker* error" at sentencing. Having defined the error, we now proceed with the plain error analysis.

## B. Plain Error Analysis

Obviously, the first and second prongs of the plain error standard are met. As stated above, the district court committed "non-constitutional *Booker* error" based on its mandatory application of the guidelines. Second, the error is "plain" because *Booker* renders the error both clear and obvious on appeal. *Gonzalez-Huerta*, 403 F.3d at 732. The question then is whether Kregas can satisfy the third and fourth prongs of plain error review.

Under the third prong, Kregas must show that the error affects his substantial rights, that is, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Dazey*, 403 F.3d at 1175 (quotations omitted). However, we need not decide whether Kregas has satisfied the third prong of the plain error standard because, even if he has, we conclude he has not met the fourth prong. *See Gonzalez-Huerta,* 403 F.3d at 736 (concluding it was not necessary to determine whether the third prong of the plain error test was met

-17-

because the fourth prong must also be satisfied to obtain relief and the fourth prong was not met).

"Under the fourth prong of plain-error review, a court may exercise its discretion to notice a forfeited error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* If "non-constitutional [*Booker*] error" is involved, as in this case, the standard for satisfying the fourth prong is "demanding"—the defendant must show that the error is "particularly egregious" and that our failure to notice it would result in a "miscarriage of justice." *Dazey*, 403 F.3d at 1178 (citation & quotations omitted)*; Gonzalez-Huerta*, 403 F.3d at 736-37. We have recognized that in most cases involving "non-constitutional *Booker* error" the defendant will be unable to satisfy the fourth prong. *See United States v. Trujillo-Terrazaz*, 405 F.3d 814, 820-21 (10th Cir. 2005) (recognizing difficulty in establishing fourth prong in cases involving "non-constitutional *Booker* error" but finding that defendant had met fourth prong). This case is no exception.

Kregas received a sentence within the national norm as established by the guidelines and there is no evidence supporting a lower sentence. *See Gonzalez-Huerta*, 403 F.3d at 738-39 (considering in fourth prong analysis whether the defendant received a sentence within the guidelines/national norm and whether the record supported a lower sentence). At sentencing, Kregas sought a three-level downward adjustment based on his role in the offense and a downward departure

based on aberrant behavior.  In support of his downward departure motion, Kregas emphasized his law-abiding life since the offense and the absence of any criminal history other than some non-moving traffic violations.  Despite recognizing its authority to apply a downward adjustment and/or to downward depart, the court chose not to do so.  Although a court's authority to depart downward pre-*Booker* was more constrained than it is post-*Booker*, we find the district court's explicit decision not to exercise its pre-*Booker* discretion compelling.  *See United States v. Lawrence*, 405 F.3d 888, 908 (10th Cir. 2005) (finding that the district court's refusal to depart downward is further evidence the court felt the seventy-two month sentence was appropriate and that it would have imposed the same sentence under an advisory guidelines scheme).

Equally compelling are the district court's statements at sentencing.  In relevant part, the court stated:

> Mr. Kregas, before I do the formal sentencing, I'll tell you what I think. My obligation is to be candid also.  I don't believe your testimony.  The jury didn't believe your testimony, and I don't either.
>
> . . . .
>
> But, the bottom line, as you refer to it, in business is honesty. . . . [C]ommercial transactions require . . . that people . . . are honest.  The whole country runs on credit, and the people who extend hard dollars have to be able to rely on what they're told as to what their risks are.
>
> Now, I am going to punish you with a 21 month sentence because you're dishonest.  It's not that you're a bad man.  I believe what is in

-19-

these letters, except[] for one thing, trustworthiness.

[W]e have these guidelines, and they represent the considered judgment of not only the Sentencing Commission, but [] Congress . . . .

The fundamental [policy] that was behind them . . . is . . . look, people who commit crimes have to be punished according to these categories that are established. . . .

. . . .

[W]hat really was one of the motivations for establishing the Commission and the guidelines is that judges, in the view of Congress, were inconsistent with themselves and also among judges, and there was a great concern that people . . . who otherwise were fine people were getting off. They weren't being punished. Other people who didn't present such a good background were getting punished too much.

Now, its not a question of the individual so much anymore under the law. It's a question of what you did. You get punished for what you did, no[] matter who you are. . . .

So, that's the spirit in which I'm imposing this sentence. I believe you to be a good man. I believe that you come from a fine family, and that this is inconsistent with your . . . life otherwise. But, . . . you're going to appeal this, I'm sure, so, . . . I'm just telling you what I think. . . . I have to punish the crime.

. . . .

People in your very same situation have to know if you make this kind of a move, you're going to do time, just like bank robbers and drug traffickers and everybody else.

(R. Vol. IX at 20-23.)

None of these statements express a dissatisfaction with Kregas' sentence;

-20-

indeed, it appears the district court felt a twenty-one month sentence was appropriate. Therefore, there is no indication the district court would impose a significantly different sentence under an advisory sentencing system. *See Lawrence*, 405 F.3d at 907 ("Whether the district court would simply reimpose the same sentence on remand, or whether instead the sentence 'would likely change to a significant degree if [the case] were returned to the district court for discretionary resentencing,' is one factor to consider in determining whether the defendant can satisfy the fourth plain-error prong.") (quoting *Gonzalez-Huerta*, 403 F.3d at 743-44 (Ebel, J., concurring)).

Moreover, these statements demonstrate a consideration and rejection of a majority of the factors listed in 18 U.S.C. § 3553(a), including "the history and characteristics of the defendant" and the need for the sentence imposed to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment" and "afford adequate deterrence." *See Booker*, 125 S.Ct. at 764 ("Without the 'mandatory' provision, the [Sentencing Reform Act of 1984] nonetheless requires judges to take account of the Guidelines together with other sentencing goals" contained in 18 U.S.C. § 3553(a).). Having rejected these factors once, there is no reason to believe the district court would now consider them sufficient enough to warrant a lower sentence. Therefore, declining to notice the *Booke*r error in this case would not offend core notions of justice. Based on the

above, Kregas fails to satisfy the fourth prong of plain error review; thus, we decline to exercise our discretion to correct the error below.

IV. Conclusion

Having failed to satisfy plain-error review, Kregas' sentence is AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge